IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHAD PARKER, REBECCA KENWICK-PARKER, MARK REDMAN, and DONNA REDMAN,<br><br>Plaintiffs,<br><br>v.<br><br>TOM WOLF, in his official capacity as Governor for the State of Pennsylvania; JOSH SHAPIRO, in his official capacity as Attorney General of the State of Pennsylvania; and DR. RACHEL LEVINE, in her official capacity as Secretary of Health, Pennsylvania Department of Health,<br><br>Defendants. | **COMPLAINT** |

Plaintiffs Chad Parker, Rebecca Kenwick-Parker, Mark Redman, and Donna Redman (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

**INTRODUCTION**

1.     Engraved by the steps of the Pennsylvania State Capitol in Harrisburg is a quote from Benjamin Franklin stating, "Those who would give up essential

liberty, to purchase a little temporary safety, deserve neither liberty nor safety." This, unfortunately, is the current situation in Pennsylvania.

2.      John Adams warned: "But a Constitution of Government once changed from Freedom, can never be restored.  Liberty once lost is lost forever."  Plaintiffs bring this action because they reasonably fear that the draconian encroachments on their freedoms set forth in this Complaint will become the "new norm."  It has been said that all tyranny needs to gain a foothold is for people of good conscience to remain silent.

3.      Our Constitution was designed to advance two primary and related goals: prevent tyranny and protect liberty.  These important goals are advanced by Article IV, Section 4, which is a "guarantee" that each state will have a "Republican Form of Government" ("Guarantee Clause").

4.      In discussing the Guarantee Clause, James Madison emphasized the federal government's obligation to ensure that states maintain a republican form of government: "In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. . . . *But a right implies a remedy*; and where else could the remedy be deposited, than where it is deposited by the Constitution?"  The Federalist No. 43 (James Madison). (emphasis added).

- 2 -

5.      The stated pandemic has been exploited such that the citizens of Pennsylvania no longer have a Republican Form of Government.  The power and authority of the legislature has been nullified.  Defendant Wolf has assumed the power to lord over the lives of Pennsylvanians like a king, mandating restrictions that deprive citizens, including Plaintiffs, of their fundamental liberties.  The Pennsylvania Supreme Court has ratified this "monarchial innovation."  The citizens of Pennsylvania have no recourse but to seek relief from this tyranny through the United States Constitution and this Court, the guardian of the freedoms guaranteed by that historically important document.

6.      This civil rights action is brought under the First, Fourth, and Fourteenth Amendments to the United States Constitution; Article IV, Section 4 of the United States Constitution; and 42 U.S.C. § 1983, challenging Defendants' policies, practices, and procedures as set forth in this Complaint.

7.      Plaintiffs seek a declaration that the enactment and enforcement of the challenged contact tracing program and mask mandate as set forth in this Complaint violate their fundamental liberties and rights secured by the United States Constitution and an order enjoining the same.  Plaintiffs seek a declaration that the authority exercised by Defendant Wolf pursuant to his "emergency powers" since the Pennsylvania General Assembly sought to revoke those powers on June 9, 2020, via a concurrent resolution violates the Guarantee Clause and the Equal Protection

Clause of the Fourteenth Amendment and thus his executive orders and the associated orders of Defendant Levine issued since that time under the "emergency powers" are null and void.  Plaintiffs also seek an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws.

8.     While claims arising under the Guarantee Clause are typically dismissed as posing a nonjusticiable political question, Plaintiffs agree with Professor Erwin Chemerinsky that "the time is clearly approaching in which the [Supreme] Court may be quite willing to reject the view that cases under the Guarantee Clause should always be dismissed on political questions grounds. . . . [T]he Guarantee Clause should be regarded as a protector of basic individual rights and should not be treated as being solely about the structure of government. Accordingly, judicial interpretation and enforcement is in accord with the preeminent federal judicial mission of protecting individual rights and liberties." Erwin Chemerinsky, *Cases under the Guarantee Clause Should Be Justiciable*, 65 U. Colo. L. Rev. 849, 851 (1994).

9.     In light of the current crisis, and Plaintiffs refer here *not* to the declared pandemic but to the loss of civil liberties during this pandemic, now is the "time" for the courts to consider Guarantee Clause claims in order to protect "basic individual rights."

## JURISDICTION AND VENUE

10.     This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex parte Young*, 209 U.S. 123 (1908), and by the general legal and equitable powers of this Court.

12.     Plaintiffs' claim for an award of their reasonable costs of litigation, including attorneys' fees and expenses, is authorized by 42 U.S.C. § 1988 and other applicable law.

13.     Venue is proper under 28 U.S.C. § 1391(b) because the Office of the Governor of Pennsylvania, the Office of the Pennsylvania Attorney General, and the Pennsylvania Department of Health are located in this judicial district and all Defendants are residents of the State in which this district is located.

## PARTIES

14.     Plaintiffs Chad Parker and Rebecca Kenwick-Parker (collectively referred to as the "Parker's") are adult citizens of the United States and residents of Pennsylvania.  Together, they are the parents and legal guardians of six minor children.

15.    The Parker's object to the challenged contact tracing program and mask mandate, and they have been, and continue to be, irreparably harmed by them.

16.    The Parker's also object to Defendant Wolf's unilateral exercise of power and are thus disenfranchised by the fact that their representatives in the General Assembly have been rendered impotent by Defendant Wolf's exercise of his "emergency powers."

17.    Plaintiffs Mark and Donna Redman (collectively referred to as the "Redman's") are adult citizens of the United States and residents of Pennsylvania. The Redman's are parents and legal guardians of two sixteen-year-old children (twins).  Donna is the biological mother, and Mark is the stepfather.

18.    The Redman's object to the challenged contact tracing program and mask mandate, and they have been, and continue to be, irreparably harmed by them.

19.    The Redman's also object to Defendant Wolf's unilateral exercise of power and are thus disenfranchised by the fact that their representatives in the General Assembly have been rendered impotent by Defendant Wolf's exercise of his "emergency powers."

20.    Defendant Tom Wolf is the Governor of the State of Pennsylvania.

21.    Under color of state law, Defendant Wolf has issued various executive orders pursuant to his "emergency powers," and he has implemented and enforced the challenged contact tracing program and mask mandate as set forth in this

Complaint.  Defendant Wolf will continue to issue executive orders in light of the declared COVID-19 pandemic and the recurrence of the spread of this virus as predicted by Defendant Levine.   Indeed, there is no end in sight as to when Defendant Wolf will relinquish his "emergency powers."

22.    Defendant Wolf is sued in his official capacity only.

23.    Defendant Josh Shapiro is the Attorney General of Pennsylvania.  The Attorney General is the state's top law enforcement official.

24.    As the Attorney General and under color of state law, Defendant Shapiro has authority to investigate and enforce violations of Defendant Wolf's executive orders, and he has the authority to investigate and enforce the challenged contact tracing program and mask mandate as set forth in this Complaint.

25.    Defendant Shapiro is sued in his official capacity only.

26.    Defendant Dr. Rachel Levine is the Secretary of Health for the Pennsylvania Department of Health.

27.    As the Secretary of Health for Pennsylvania and under color of state law, Defendant Levine is responsible for implementing and enforcing the challenged contact tracing program and mask mandate as set forth in this Complaint.

28.    Defendant Levine is sued in her official capacity only.

**STATEMENT OF FACTS**

29.    On or about March 6, 2020, Defendant Wolf issued a Proclamation of

Disaster Emergency, thereby invoking his "emergency powers" and allowing him to act unilaterally, without any checks or balances to his power. The alleged basis for the invocation of these extraordinary powers was the threat of a COVID-19 pandemic in the state.

30.     On or about March 9, 2020, Defendant Levine announced the presence of 10 suspected cases of COVID-19 in Pennsylvania and stated that the Commonwealth would start contact tracing.

31.     On or about April 1, 2020, Defendant Wolf issued a state-wide, stay-at-home order pursuant to his "emergency powers." The stay-at-home order was the equivalent of a house arrest for the citizens of Pennsylvania, including Plaintiffs. Yet, there was no probable cause requirement to restrict Plaintiffs' liberty nor a process by which the order could be challenged by Plaintiffs.

32.     At that time, Plaintiffs were told that the stay-at-home order was required to ensure that the hospitals were not overrun and to "flatten the curve." Plaintiffs were willing to cooperate given this explanation and what certainly appeared to be a short-term restriction. However, both of the conditions were met, yet the draconian restriction remained.

33.     On or about May 20, 2020, Defendant Wolf publicly stated that a "foolproof" vaccine would be required before the state could return to "normal." However, there is no such thing as a "foolproof" vaccine. In other words, Defendant

Wolf has no intention of relinquishing his extraordinary "emergency powers" any time in the near future.

34.     On or about May 20, 2020, it was revealed that several states, including Pennsylvania, were combining the results from viral and antibody COVID-19 tests when reporting the testing totals, despite marked differences between the tests.  The combining of the tests leads to the skewing of the overall positivity rate of the tests, a measurement that is one of the benchmarks used in reopening guidelines.

35.     In addition, states were including "probable cases" in the overall case count without distinguishing between a confirmed case and a probable case.  And the criteria for counting a "case" is constantly changing.  For example, on or about August 29, 2020, the Pennsylvania Department of Health announced the following: "Persons with a positive antibody (serology) test, moving forward, will no longer be considered a probable case.  However, cases previously counted as probable cases, using the prior national case definition, will remain counted as probable cases."

36.     The New York Times reported on August 29, 2020, that there are significant problems with COVID-19 test results, noting that "[t]he standard tests are diagnosing huge numbers of people who may be carrying relatively insignificant amounts of the virus."

37.     On or about May 28, 2020, the General Assembly passed House Resolution 836, a Concurrent Resolution that terminates the March 6, 2020,

Proclamation of Disaster Emergency issued by Defendant Wolf.  Accordingly, the resolution sought to terminate the unilateral, authoritarian "emergency powers" of Defendant Wolf.

38.     On or about June 3, 2020, Defendant Wolf violated his own executive order by marching in a "Black Lives Matter" protest.  Defendant Wolf joined hundreds of demonstrators as they marched through Harrisburg, Pennsylvania to protest the police killing of George Floyd, a black man from Minnesota.



39.     Defendant Levine defended Defendant Wolf's actions, claiming that regardless of the order, "people have the right to protest, and to demonstrate, and the right to free speech."  Defendant Levine stated further that Defendant Wolf is "not restricting people's right to protest," adding that "[t]here are all obviously significant social issues that are present, that people feel that they need to have a voice, and so the governor is always supportive of that and is participating."  However, Defendant Wolf denounced those protesting his edicts as "ignoring the danger of COVID-19,"

and he has called state and county politicians who oppose him "cowardly" for seeking to defy his stay-at-home orders.  In other words, if the activity fits Defendant Wolf's personal, political agenda, then the rules do not apply.

40.     On or about June 3, 2020, Defendant Wolf extended his "emergency powers" for another 90 days.

41.     On or about June 19, 2020, the Pennsylvania Department of Health announced that more than 4,000 close contacts of COVID-19 cases have been identified and monitored to date through the contact tracing efforts of 500 trained contact tracers throughout the state.   Defendant Levine remarked that the Department of Health is "now equipped with hundreds of contact tracers."

42.     On or about July 1, 2020, Defendant Levine issued an order mandating "universal face coverings," thereby requiring all persons in Pennsylvania to wear a face mask when leaving their home ("mask mandate").  A true and correct copy of the mask mandate, which is incorporated herein by reference, is attached to this Complaint as Exhibit 1.

43.     More specifically, pursuant to the mask mandate, individuals are required to wear a face mask when outdoors and unable to consistently maintain a distance of six feet from individuals who are not members of the same household and when in any indoor location where members of the public are generally permitted.  However, the propaganda message from Defendants Wolf and Levine is

that masks are required *anytime* an individual leaves the home.  Defendant Wolf creates conflict between citizens when he publicly states that people are required to wear masks every time they leave home, but then purposely excludes the "unless 6 feet apart" component of the mask mandate.

44.    For many individuals, including Plaintiffs, a face mask is a symbol of oppression and an attempt by the government to control the citizenry.  This view was recently expressed by the below political cartoon published in the Wall Street Journal:



45.    Additionally, journalists are constantly attempting to get photographs of President Trump wearing a mask because it is a political issue.  Many politicians who publicly support mask wearing for political reasons (it makes the pandemic look and appear worse than what it is) would often not wear one until the cameras were rolling, at which time they would dutifully don the mask for public consumption.

46.    For many, including Plaintiffs, forcing them to wear a face mask is

forcing them to convey a message with which they disagree.  Wearing a mask conveys the message that the wearer has surrendered his or her freedom to the government, particularly in light of the facts of this current declared pandemic. During this current political climate, a mask has become a symbol of government oppression.  Because a mask has become a political symbol during this current and highly politicized pandemic, the wearing of a mask is a form of symbolic speech. Consequently, via the mask mandate, Defendants are compelling Plaintiffs to engage in a form of expression and to convey a message with which they disagree.

47.    The mask mandate presumes that all people are diseased and thus makes the wearer contribute to a false public statement that all people are in fact diseased.

48.    Plaintiffs also object to the mask mandate because it violates their privacy interests, including their right to bodily integrity and personal autonomy free from government interference.  In this regard, Plaintiffs agree with the oft-quoted mantra, "My body, my choice."

49.    A mask is required for everyone, even though the vast majority of individuals required to wear one are healthy or are not in a group with a high risk to contract COVID-19.  And while science and data show that the vast majority of Americans are healthy (80% to 90% do not have COVID or a comorbidity that would make them susceptible to COVID), the mask mandate presumes that all citizens are

diseased unless proven healthy.  The mask mandate is forcing every Pennsylvanian, including Plaintiffs, to become the government's patient without the citizen's consent.

50.    The mask mandate creates a false public impression that private citizens must rely on the government for their safety, thereby allowing Defendants to use the mandate as a tool for maintaining power and authority.

51.    Remarkably, an exception to the mask mandate is provided for individuals with a medical condition, "including those with respiratory issues that impede breathing."  In other words, masks are not required to be worn by individuals who are most susceptible to COVID-19, a virus that attacks the respiratory system.

52.    Defendant Wolf has resorted to social media to publicly shame individuals who object to wearing face masks.  Indeed, as an example of Defendant Wolf's Orwellian Newspeak, he proclaimed on social media that "[w]earing a mask gives us more freedom to do the things we love . . . ."

53.    Defendant Levine has joined in the effort to shame those who oppose the mask mandate, stating, "My mask protects you, and your mask protects me. Wearing a mask shows that you care about others, and that you are committed to protecting the lives of those around you."  This mantra presumes that everyone is, at all times, a potential carrier of the virus, when the vast majority of the population is not.  This type of propaganda stokes conflict between citizens, and it weaponizes the

issue of mask wearing.  Further, by requiring healthy people to wear masks, Defendants can magnify the risk of the virus in order to maintain control.  This type of propaganda and forcing of morality goes far beyond a disaster emergency declaration related to a virus.

54.    The mask mandate is a tool to create conflict and to divide citizens against each other during this politically-charged election year.  The mandate is a way in which political leaders, such as Defendant Wolf, can promote the narrative that this declared pandemic is far worse than what it really is.

55.    Defendants further exacerbate the division caused by the mask mandate by establishing a "snitch line" that allows someone to report directly to the Pennsylvania Department of Health perceived violations of the mask mandate or other COVID-related restrictions.

56.    Mandating the wearing of masks as a means of limiting disease spread is not based on science, and this includes the wearing of *proper* personal protective equipment (PPE), such as the N-95 masks, and not the largely useless coverings approved by Defendants' mask mandate.  The Lancet study, often cited in support of mask wearing, actually concluded that the use of PPE to contain transmission was of "low certainty," saying anecdotally that what protective value it had was higher for N95 respirators, but that this indicated protection for the wearer, not for others.

57.    A study posted on the Centers for Disease Control's (CDC) website in

May 2020, concluded as follows: "Disposable medical masks (also known as surgical masks) are loose-fitting devices that were designed to be worn by medical personnel to protect accidental contamination of patient wounds, and to protect the wearer against splashes or sprays of bodily fluids (36).  There is limited evidence for their effectiveness in preventing influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure. Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza."  This study can be found at https://wwwnc.cdc.gov/eid/article/26/5/19-0994_article (last visited on Aug. 26, 2020).

58.     Defendants also ordered on August 17, 2020, that all students attending primary and secondary schools must wear masks, even if social distancing can be maintained.   However, according to the Pennsylvania Department of Health, children ages 0 to 19 make up less than 8% of total confirmed and presumed positive COVID-19 cases.  The Department does not list any deaths in this age demographic. Further review of the Department of Health data shows that the COVID-19 virus is more serious for the elderly population, not for students.  The last-minute order caused chaos and confusion in school districts that were getting ready to start the school year in less than three weeks.

59.     The wearing of masks can have negative consequences for the wearer.

In March of this year, a paper was published by the Journal of Infectious Diseases and Epidemiology that conducted a survey of 343 frontline healthcare workers in New York City responding to the first wave of COVID-19.  In this survey, 314 respondents reported adverse effects from prolonged mask use with 245 reporting headaches being the most common complaint.  Skin breakdown was the second most common issue with 175 respondents, and impaired cognition was reported in 81 respondents.  Many experienced resolved side effects once masks were removed, while others required physical or medical intervention.  Thirty percent of those who reported headaches reported them after 3 or more hours of wear.

60.    Consequently, a least restrictive means of accomplishing Defendants' objectives for the mask mandate (to apparently limit the harmful spread of the virus) is to have those who are susceptible to COVID-19 (the elderly and persons with pre-existing conditions) to wear N95 respirators when they leave their homes if they are concerned about contracting the disease.

61.    Indeed, we do not live in a "nanny state."  It should be up to each individual to decide whether he or she should wear a mask based on his or her own personal situation and concerns.  The U.S. Constitution guarantees freedom from such government interference with a private citizen's personal life.

62.    On or about July 1, 2020, the Pennsylvania Supreme Court ruled 4-3 in favor of Defendant Wolf on House Resolution 836, holding that the resolution must

be presented to Defendant Wolf for signature.

63.    On or about July 8, 2020, House Resolution 836 was presented to Defendant Wolf.

64.    On or about July 14, 2020, Defendant Wolf vetoed House Resolution 836.  Defendant Wolf refused to approve the resolution because it robs him of his extraordinary "emergency powers."  In his veto message, Defendant Wolf stated, "At some point, we will be ready as a Commonwealth to move past the disaster emergency currently challenging us.  But that day is unfortunately not yet here." Indeed, there is no end in sight for Defendant Wolf because he does not want to surrender his unilateral power to lord over the citizens of Pennsylvania.

65.    On or about July 10, 2020, the Pennsylvania Department of Health received emergency approval to spend $2 million to ramp up contact tracing by way of a contract with a software company to develop a smartphone app for contact tracing.

66.    On or about July 17, 2020, the Pennsylvania Department of Health received emergency approval to spend $25 million to recruit, hire, and train 4,000 contact tracers in 90 days.

67.    On or about July 22, 2020, the Pennsylvania Department of Health issued a press release, confirming that it is expanding its contact tracing resources, but concealing the earlier approvals to spend $27 million on contact tracing.  The

Department noted that "[c]ontact tracing is the process of identifying, notifying, and monitoring anyone who came in close contact with an individual who tested positive for COVID-19 while they were infectious."  According to the Department, "Our estimates show that the state needs about 625 contact tracers.  However, this number could grow hundreds, even thousands, depending on the resurgence of COVID-19 in the fall."  The Department concludes by stating, "Between June 29 and July 13, contact tracers have enrolled 3,638 contacts in the Sara Alert system.  The Sara Alert, working alongside our disease surveillance system (NEDSS), offers contact tracers the ability to track, monitor, isolate and test symptomatic contacts and is further enhanced by the use of technology applications.  This web-based monitoring tool enable[s] contact tracers to send daily emails, texts and/or phone calls to cases and identified close contacts throughout their isolation/quarantine monitoring period.  This technology enhances the contact tracer's ability to promptly respond and provide guidance to symptomatic individuals."

68.   On July 23, 2020, the Pennsylvania Department of Health posted Request for Expression of Interest 001746 (RFEI 001746) on the Commonwealth's eMarketplace portal.  RFEI 001746 seeks "expressions of interests" from firms to "implement a Contact Tracing Management System."  The materials describing RFEI 001746 show that this is in fact the creation of a massive and permanent database that will be used to surveil the population of Pennsylvania.

69.     According to the Pennsylvania Department of Health, an individual who is tested and confirmed positive for COVID-19 is considered a "case."

70.     However, the "positive" result is terribly flawed because the testing relied upon by Defendants for this result is terribly flawed, as set forth in this Complaint.

71.     According to the Pennsylvania Department of Health, "Within 24 hours of receiving the positive result, trained public health staff conduct an interview with the case to obtain a list of close contacts they had while infectious. . . .  The cases are encouraged to utilize calendars, social media, etc. to remember where and who they were around during their infectious period.  During the case investigation, the public health staff attempt to obtain as much information as possible on the contacts (address, phone, email, etc.) and then share the contact information with the designated contact tracers."  All of this information is then compiled and retained in a government database.

72.     On or about July 31, 2020, the Pennsylvania Department of Health announced that it intended "to recruit, hire, train, and support 1,000 paid contact tracing staff to further COVID-19 contact tracing efforts" in the state.  This is "an additional 1,000 contact tracing staff to the 654 contact tracers across the state currently." The announcement did not disclose that the Department intends to hire up to 4,000 paid contact tracers.

73.    In this public announcement, the Department stated, "A case investigation is the identification and investigation of patients who are classified as being a confirmed or *probable* case of COVID-19.  Contact tracing is the subsequent *verification*, *monitoring*, and support of their contacts who have been exposed to and *possibly* infected with the virus."  (emphasis added).

74.    On August 4, 2020, the Pennsylvania Department of Health posted Request for Application (RFA) 67-116 on the Commonwealth's eMarketplace portal.  RFA 67-116 seeks to spend $60,000,000 on "hub and spoke" COVID-19 testing.  The bid documents indicate that the contract will run through June 30, 2022, and that the objective is to test 5% of the population every month, which is approximately 640,000 people.  This "hub and spoke" rapid testing capability is part and parcel of the contact tracing program: "test, trace, stay in place."  And it will lead to more contact tracing and surveillance of private citizens with no regard for the fact that it is not necessary.

75.    As part of the challenged contact tracing program, restaurants are encouraged to "utilize reservations for dining on premises to maintain records of all appointments, including contact information for all customers."  Similarly, salons and barbershops are required to conduct business by appointment only.

76.    The Pennsylvania Department of Health, in conjunction with the Pennsylvania Department of Education, directly implements and enforces the

challenged contact tracing program within the public schools. To more effectively implement the program, the Department of Health requires each school to "[t]ake measures that allow for exposed individuals to be more easily traced," including, the "[u]se of assigned seating for each class," "tak[ing] attendance for every class and including all individuals (staff and contractors) who were in the classroom," "us[ing] sign-in sheets for in-person meetings to document staff attendees," and "keep[ing] accurate records of any persons other than students and staff that enter the building, their reason for being there, the locations in the building they visit, and the names of close contacts they visit in the building."

77.    On or about July 14, 2020, Plaintiff Chad Parker believed he had a sinus infection and so he sought medical treatment. On or about July 19, 2020, he was tested for COVID-19, and on or about July 24, 2020, his test came back positive. Plaintiff Chad Parker works for a government employer, which follows the CDC guidance for when a person who tests positive for COVID-19 is cleared to return to work. Pursuant to that guidance, Plaintiff Chad Parker was cleared on July 24, 2020, and he returned to work on July 25, 2020.

78.    On or about July 25, 2020, Plaintiff Chad Parker was contacted by a contact tracer pursuant to the challenged contact tracing program. The contact tracer asked probing questions, including who Plaintiff Chad Parker lives with, the ages of the individuals he lives with, the names of any businesses or other places he recently

visited, and the names and contact information of any people he recently visited or had contact with.  Plaintiff Chad Parker was disturbed by the intensive questioning by this government investigator and by the investigation itself, which sought personal and private information regarding his personal and private contacts and associations.

79.     In a press release posted on or about August 31, 2020, the Pennsylvania Department of Health acknowledged the following with regard to the challenged contact tracing program: "During the case investigation, public health professionals spend 30 to 60 minutes asking questions to ensure all potential close contacts are identified.  They collect information about who the case came in contact with and where they went while they were infectious."

80.     Shortly following the probing phone call with the contact tracer, the Parker's received a letter in the mail from the Pennsylvania Department of Health dated July 25, 2020 (hereinafter "DOH Letter").  A true and correct copy of the DOH Letter, which is incorporated herein by reference, is attached to this Complaint as Exhibit 2.

81.     The DOH Letter was addressed to the "Parker/Kenwick Family."  The letter made explicit that "[t]he Secretary of Health is *directing* you as a close contact of a person that has COVID-19 to self-quarantine in your home."  (emphasis added). The letter states that "[t]his authority is granted to the Secretary of Health under the

law," citing as authority, *inter alia*, various sections of the Disease Prevention and Control Law and the Department of Health's regulations found at 28 Pennsylvania Code Chapter 27.

82.   During the mandated, 14-day quarantine (house arrest), the DOH Letter also "directed" the Parker's to, *inter alia*, "[m]aintain social distancing of at least 6 feet from family members" and to "[c]ooperate with the monitoring and other contacts of the Department or its representatives."

83.   The DOH Letter concludes with a stern warning: "You must immediately adhere to this quarantine directive and all disease control measures included in it.  If you do not cooperate with this directive, the Secretary of Health may petition a court to have you *confined* to an appropriate place chosen by the Department. . . .  This may be a hospital, or some other appropriate place, *whichever the Department determines is best suited for your case.  You will be kept there until the Department determines it can release you from quarantine.  Law enforcement may be called upon, to the extent necessary, to ensure your compliance with this directive*."  (emphasis added).

84.   Pursuant to 28 Pennsylvania Code Chapter 27, a violation of the Pennsylvania Department of Health's directives as set forth in the DOH Letter could result in criminal penalties (§ 27.8).   Additionally, Chapter 27 gives the Pennsylvania Department of Health very broad, plenary, and punitive powers.  For

example, among other powers, the Department has the power to isolate, quarantine, segregate, and surveil individuals without a warrant or consent (§ 27.60(a)); it has the power to define the conditions of the quarantine (§ 27.65); it has the power to put a placard/sign in front of a person's home if the Department believes that the person is not "fully" compliant (§ 27.66); it has the power to restrict physical movement, requiring the quarantine to "take place in an institution where the person's movement is physically restricted" (§ 27.88(a)); it has the power to "treat" minors without parental consent (§ 27.97); it has the power to isolate a person if he or she refuses treatment (§ 27.87(a)); it has the power to enter a home without a warrant or consent (§ 27.152(b)); and it has the power to review confidential medical records without a warrant or consent (§ 27.152(c)).  All of these powers are available to the Department to enforce the challenged contact tracing program.

85.    As a result, the Pennsylvania Department of Health has the authority to remove minor children from their homes and place them in an isolated quarantine location without parental consent pursuant to the contact tracing program.

86.    At all relevant times, the Parker's, including their children, lived in close contact with each other in the same household.  Accordingly, their exposure to COVID-19 via Plaintiff Chad Parker had begun as early as July 14, 2020, and yet none of the family members demonstrated any symptoms.  Nonetheless, the Parker's and their children were forced to quarantine (house arrest) for 14 days *beginning* on

July 25, 2020.

87.     There was no process in place to challenge this forced quarantine (house arrest) nor were Defendants required to demonstrate probable cause that this quarantine (house arrest) was necessary.  Indeed, it was not necessary as the period of infection had already expired prior to the imposed quarantine (house arrest).

88.     From the date of his first phone call with a contact tracer to on or about August 24, 2020, Plaintiff Chad Parker received approximately 14 texts a day as a result of the challenged contact tracing program.  The text messages required responses to a "Daily Self-Report."  There was no way to stop the incessant messages, which were apparently generated by the Sara Alert system.  Moreover, pursuant to the DOH Letter, the Parker's were required to "cooperate" and thus respond.

89.     Because the Parker's are now in Defendants' contact tracing database, they reasonably fear that they will be subjected once again to a quarantine.  At a minimum, they object to being subjected to surveillance, having their personal medical records reviewed by the Pennsylvania Department of Health, and being in the government's database.

90.     Plaintiff Rebecca Kenwick-Parker homeschools her three biological children, giving them the option to attend public school once they reach the 8th grade.  Plaintiff Rebecca Kenwick-Parker's 14-year-old son (her oldest biological

child) attended public school last year (8th grade) and was planning on attending public high school (9th grade) this year (2020).  However, due to the contact tracing program and the mask mandate, the Parker's were forced to keep him home, causing them to scramble to find a homeschool high school curriculum and thus incurring additional costs for that curriculum as well.  So long as the contact tracing program and mask mandate remain in effect, the Parker's will not send Plaintiff Rebecca Kenwick-Parker's biological children to public school.

91.     Because of the challenged contact tracing program and mask requirement, the Parker's are suffering and will continue to suffer irreparable harm.

92.     The Redman's two children are 11th grade students at Delaware Valley High School in Pennsylvania.  School opened on September 2, 2020.

93.     Because of the challenged contact tracing program, particularly as it will apply in the public schools, the Redman's are being forced to have their children attend school remotely rather than attending in person.  The risk of having their children subjected to the oppression and penalties associated with the challenged contact tracing program while attending a public school is too great.

94.     The Redman's children will be at a disadvantage by not attending school in person.  The children will not have the benefit of socializing with their peers—an important factor for young people, especially teens.  The children will not have the advantage of interacting personally with their teachers or being present in

classes such as laboratory science where a student's presence is important. And the children will have the stigma of being at home and present only in a virtual sense.

95.     The Redman's decision not to send their children to school was a very difficult decision, but they had no choice due to the contact tracing program and the powers granted to the Pennsylvania Department of Health pursuant to this program. These boys in particular are especially affected because of special requirements where an in-person school environment is important and beneficial. The Redman's also object to the fact that their children would be forced to wear masks throughout the entire school day if they attended in person, even when appropriate social distancing could be achieved.

96.     Prior to the implementation of the contact tracing program, the Redman's used Life360—a smartphone application that allowed them to track the whereabouts of their children. However, because of the challenged contact tracing program, the Redman's do not want to have any data or information available that Defendants may seize to quarantine not only their children, but also others with whom they associate. The Redman's have also purposely deactivated updates to their cell phones to avoid the unwanted installation of tracking and surveillance software. Despite these efforts to avoid "Big Brother," a COVID-19 tracker was installed on several phones.

97.     Defendants have issued orders limiting the number of people that can

be in a congregate setting.  As a result, the Redman's usual house of worship requires pre-registration in order to attend in-person services within the church.  Because of the challenged contact tracing program, the Redman's have curtailed attending religious services to avoid providing data or information that Defendants may acquire or seize to quarantine them, their children, or others with whom they associate.

98.    Because of the challenged contact tracing program and mask requirement, the Redman's are suffering and will continue to suffer irreparable harm.

99.    The challenged contact tracing program is dangerous.  It would permit a desperate and unscrupulous political operative to dampen voter participation in a given district.  It would permit a desperate and unscrupulous business owner to stifle competition.  Either could falsely and anonymously report incidences of coronavirus without fear of repercussion.  Trolls could create chaos.  Protesters could trigger panic as a form of civil disobedience.  Hostile foreign intelligence operatives could shut down an entire city by falsely reporting COVID-19 infections in every neighborhood.  The abuses permitted by granting the government such power are practically without limits.

100.   Defendants consistently assert that the restrictions they have imposed upon the fundamental liberties of Pennsylvanians are based on science and data, yet

they refuse to provide the evidence they purportedly rely upon.

101.   The CDC daily publishes numbers on their website reflecting the total number of COVID-19 cases in the United States and the total number of COVID-19 deaths.  While this number changes daily, a snapshot of the numbers on August 23, 2020, reveals a fatality rate of 3% based on reported numbers.  However, repeated studies done in multiple countries (including CDC studies done in the United States) indicate that the actual infection rate is estimated to be between 10 and 110 times the reported infection rate, with the average being between 20 to 25 times.  This means that the fatality rate is very likely closer to .12% to .15%.  And among these deaths, it is known that most of them are from people who are elderly and/or already have comorbidity factors, and a significant number of reported deaths are from when COVID-19 patients were placed in nursing homes among vulnerable populations. COVID-19 related deaths in nursing homes account for about 70% of all coronavirus deaths in Pennsylvania, a number that was exacerbated by Defendant Levine's order to place active COVID patients into nursing homes.

102.   According to a recent CDC report, just *six percent* of coronavirus deaths have "COVID-19" as the only cause mentioned, revealing that *94 percent* of patients who died from coronavirus also had other "health conditions and contributing causes."

103.   In other words, science and data do not justify Defendants' suspension

of fundamental liberties as set forth in this Complaint.

104.   The U.S. Constitution and its Bill of Rights guarantee freedom. Accordingly, the government bears the burden to justify a restriction on liberty; it is not a private citizen's burden to prove his or her freedom.  Here, Defendants presume that all citizens, including Plaintiffs, are diseased (guilty), and it is the citizen's burden, without any procedure for doing so, to prove otherwise.  This is a form of tyranny that is prohibited by our Constitution.

105.   On or about August 31, 2020, Defendant Wolf extended his "emergency powers" for another 90 days.

## FIRST CLAIM FOR RELIEF

### (First and Fourteenth Amendments—Right of Association)

106.   Plaintiffs hereby incorporate by reference all stated paragraphs.

107.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right of association in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

108.   The freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech.  Indeed, implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic,

educational, religious, and cultural ends free from government intrusions or burdens.

109.   Moreover, as recognized by the U.S. Supreme Court, family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.  Consequently, it is relationships such as these that led to an understanding of freedom of association as an intrinsic element of personal liberty under the Fourteenth Amendment.

110.   As set forth in this Complaint, the challenged contact tracing program deprives Plaintiffs of their fundamental right of association in violation of the First and Fourteenth Amendments.

111.   As a direct and proximate result of Defendants' violation of the right of association under the First and Fourteenth Amendments as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF

### (Due Process—Fourteenth Amendment)

112.   Plaintiffs hereby incorporate by reference all stated paragraphs.

113.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants

have deprived Plaintiffs of their right to due process in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

114.   The challenged contact tracing program and mask mandate, as set forth in this Complaint, lack any rational basis, are arbitrary, capricious, and vague, have no real or substantial relation to the objectives of the program or mandate, and are a palpable invasion of rights secured by fundamental law in violation of the Due Process Clause of the Fourteenth Amendment.

115.   The challenged contact tracing program, as set forth in this Complaint, is unconstitutionally vague in that it fails to provide clear notice as to who may or may not be subject to the forced quarantine.  The program's ambiguity also invites discriminatory enforcement against disfavored individuals and groups.

116.   Accordingly, the challenged contact tracing program violates the Due Process Clause of the Fourteenth Amendment because it is impermissibly vague; it fails to give fair notice of the conduct that is required or prescribed; it presumes that all citizens are diseased (guilty), placing the burden on the citizen to prove otherwise without a procedure for doing so; it fails to provide minimal guidelines to govern law enforcement; and it encourages arbitrary enforcement.

117.   The challenged contact tracing program fails to provide adequate notice and an opportunity to be heard before imposing onerous and punitive restrictions on

a person's liberty in violation of the Due Process Clause of the Fourteenth Amendment.

118.   As a direct and proximate result of Defendants' violation of the Due Process Clause of the Fourteenth Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## THIRD CLAIM FOR RELIEF

### (Equal Protection—Fourteenth Amendment)

119.   Plaintiffs hereby incorporate by reference all stated paragraphs.

120.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

121.   As set forth in this Complaint, the challenged restrictions (contact tracing program and mask mandate) deprive Plaintiffs of their fundamental rights and freedoms, yet the restrictions lack any rational basis, are arbitrary, capricious, and vague, have no real or substantial relation to the objectives of the restrictions, and are a palpable invasion of rights secured by fundamental law in violation of the Equal Protection Clause.

122.   The Fourteenth Amendment's guarantee of the equal protection of the law is also a corollary to the Guarantee Clause.  As set forth in this Complaint, Defendant Wolf's unilateral exercise of power has disenfranchised Plaintiffs by the fact that their representatives in the General Assembly have been rendered impotent by Defendant Wolf's exercise of his "emergency powers," in violation of the Fourteenth Amendment.

123.   As a direct and proximate result of Defendants' violation of the equal protection guarantee of the Fourteenth Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## FOURTH CLAIM FOR RELIEF

### (Guarantee Clause—Article IV, Section 4)

124.   Plaintiffs hereby incorporate by reference all stated paragraphs.

125.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their rights secured by Article IV, Section 4 of the United States Constitution ("Guarantee Clause") and 42 U.S.C. § 1983.

126.   The Guarantee Clause is a protector of basic individual rights.

127.   The authority exercised by Defendant Wolf pursuant to his "emergency powers" since the Pennsylvania General Assembly sought to revoke those powers

on June 9, 2020, via a concurrent resolution violates the Guarantee Clause and thus Defendant Wolf's executive orders, along with the various policies and programs that would normally be subject to legislative approval, funding, and oversight, issued and adopted since that time pursuant to his "emergency powers" are null and void.

128.   As a direct and proximate result of Defendants' violation of the Guarantee Clause as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## FIFTH CLAIM FOR RELIEF

### (Right to Privacy/Due Process—Fourteenth Amendment)

129.   Plaintiffs hereby incorporate by reference all stated paragraphs.

130.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to privacy, personal autonomy, and bodily integrity secured by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

131.   The right to privacy protects Plaintiffs' personal autonomy and bodily integrity from intrusion by the government.  The mask mandate violates Plaintiffs' right to privacy.

132.   As a direct and proximate result of Defendants' violation of the Fourteenth Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## SIXTH CLAIM FOR RELIEF

### (Unlawful Search & Seizure—Fourth Amendment)

133.   Plaintiffs hereby incorporate by reference all stated paragraphs.

134.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to be free from unreasonable searches and seizures protected by the Fourth Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

135.   As set forth in this Complaint, the challenged contact tracing program authorizes government officials to search and seize private citizens, including Plaintiffs, without a warrant.

136.   The quarantine demanded by Defendants pursuant to the challenged contact tracing program is the equivalent of a house arrest.

137.   The challenged contact tracing program is arbitrary and unreasonable, and it presumes that all citizens are diseased (guilty), placing the burden on the citizen to prove otherwise without a procedure for doing so.

138.   Pursuant to the challenged contact tracing program, Defendants can search and seize private individuals, including Plaintiffs, enter and search their homes, conduct surveillance, unilaterally remove and isolate minor children, and review private records and documents without a warrant in violation of the Fourth Amendment.

139.   As a direct and proximate result of Defendants' violation of the Fourth Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## SEVENTH CLAIM FOR RELIEF

### (First Amendment—Freedom of Speech)

140.   Plaintiffs hereby incorporate by reference all stated paragraphs.

141.   By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiffs of their right to freedom of speech in violation of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

142.   The freedom of speech is not confined to verbal expression, but includes conduct that is sufficiently imbued with elements of communication.  That is because the Constitution looks beyond written or spoken words as mediums of expression and recognizes that symbolism is an effective way of communicating ideas.  Conduct, such as the wearing of a face mask during this politicized pandemic, is sufficiently communicative because it conveys a particularized message and the likelihood is great that the message will be understood by those who view it.

143.   Wearing a face mask during this current and highly politicized pandemic has become a form of expression.  The face mask is, for many, including Plaintiffs, a symbol of oppression and government tyranny.  It is a sign that the wearer is willing to surrender his or her freedoms to the government.  Plaintiffs oppose this message and thus they oppose the requirement to wear a face mask because it conveys this message.  Moreover, Plaintiffs oppose the mask mandate because science and data have shown that wearing a face mask pursuant to the mandate is not medically required or necessary, and it is harmful to the wearer.

144.   The mask mandate, as set forth in this Complaint, is compelling Plaintiffs to express a message with which they disagree in violation of their rights protected by the First Amendment.

145.   As a direct and proximate result of Defendants' violation of the right to freedom of speech under the First Amendment as set forth in this Complaint,

Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A)     to declare that Defendants violated Plaintiffs' fundamental constitutional rights as set forth in this Complaint;

B)     to enjoin Defendants' enforcement of the challenged restrictions as set forth in this Complaint;

C)     to award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

D)     to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

LAW OFFICE OF ANDREW H. SHAW. P.C.

/s/ *Andrea L. Shaw*
Andrea L. Shaw, Esq. (89333)
2011 W. Trindle Road
Carlisle, Pennsylvania 17013
(717) 243-7135

AMERICAN FREEDOM LAW CENTER

Robert J. Muise, Esq.* (MI P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org
* Subject to admission *pro hac vice*

*Attorneys for Plaintiffs*