IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHAD PARKER, REBECCA KENWICK-PARKER, MARK REDMAN, and DONNA REDMAN,<br><br>        Plaintiffs,<br><br>     v.<br><br>TOM WOLF, in his official capacity as Governor for the State of Pennsylvania; JOSH SHAPIRO, in his official capacity as Attorney General of the State of Pennsylvania; and DR. RACHEL LEVINE, in her official capacity as Secretary of Health, Pennsylvania Department of Health,<br><br>        Defendants. | 1:20-cv-01601-JEJ<br><br>(Hon. John E. Jones III) |

**BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
_____

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

PROCEDURAL HISTORY.................................................................................1

STATEMENT OF FACTS ...................................................................................2

I.     Defendant Wolf's Assertion of "Emergency Powers" ....................................2

II.    The Contact Tracing Program ........................................................................3

III.   The Mask Mandate ..........................................................................................8

IV.   Harm to Plaintiffs .........................................................................................12

V.    Science and Data Do Not Support Defendants' Restrictions ........................18

QUESTIONS INVOLVED..................................................................................20

ARGUMENT .......................................................................................................20

I.     Standard for Issuing a Preliminary Injunction..............................................20

II.    Likelihood of Success on Constitutional Claims ..........................................21

       A.     Contact Tracing Program ................................................................21

              1.    First and Fourteenth Amendments—Right to Association .........21

              2.    Fourth and Fourteenth Amendments ............................................26

       B.     Mask Mandate .................................................................................29

              1.    First Amendment ...........................................................................29

              2.    Fourteenth Amendment—Right to Privacy..................................33

III.    Irreparable Harm .......................................................................... 35

IV.    Balance of Equities ....................................................................... 36

V.    Public Interest ............................................................................... 37

CONCLUSION ........................................................................................ 37

CERTIFICATE OF COMPLIANCE ....................................................... 39

CERTIFICATE OF SERVICE ................................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*ACLU v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003)...................................................................37

*Aptheker v. Sec. of State*,
378 U.S. 500 (1964).............................................................................25

*AT&T v. Winback & Conserve Program*,
42 F.3d 1421 (3d Cir. 1994).................................................................21

*Beattie v. Line Mt. Sch. Dist.*,
992 F. Supp. 2d 384 (M.D. Pa. 2014)..................................................35

*Benner v. Wolf*,
No. 20-cv-775, 2020 U.S. Dist. LEXIS 89425 (M.D. Pa. May 21, 2020) ..............27

*Buck v. Stankovic*,
485 F. Supp. 2d 576 (M.D. Pa. 2007)..............................................35, 37

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993).........................................................................32, 35

*City of Boerne v. Flores*,
521 U.S. 507 (1997).............................................................................24

*Cnty. of Butler v. Wolf*,
No. 2:20-cv-677, 2020 U.S. Dist. LEXIS 167544 (W.D. Pa. Sep. 14, 2020)
.............................................................................1, 2-3, 19, 26-27, 28

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998).............................................................................28

*Cruzan v. Director, Mo. Dep't of Health*,
497 U.S. 261 (1990).............................................................................34

*Daniels v. Williams*,
474 U.S. 327 (1986).............................................................................28

*Davis v. Hubbard*,
506 F. Supp. 915 (N.D. Ohio 1980).............................................................34

*Doe v. Delie*,
257 F.3d 309 (3d Cir. 2001).......................................................................33

*Dunn v. Blumstein*,
405 U.S. 330 (1972)...................................................................................25

*Elrod v. Burns*,
427 U.S. 347 (1976)...................................................................................36

*Fraternal Order of Police, Lodge No. 5 v. City of Phila.*,
812 F.2d 105 (3d Cir. 1987)........................................................................22

*Fulton v. City of Phila.*,
922 F.3d 140 (3d Cir. 2019)........................................................................21

*G & V Lounge, Inc. V. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ......................................................................37

*Gallo v. City of Phila.*,
161 F.3d 217 (3d Cir. 1998)........................................................................26

*Greater Phila. Chamber of Commerce v. City of Phila.*,
949 F.3d 116 (3d Cir. 2020)........................................................................24

*Griswold v. Conn.*,
381 U.S. 479 (1965)...................................................................................27

*Grove v. City of York*,
No. 1:05-CV-02205, 2007 U.S. Dist. LEXIS 1837 (M.D. Pa. Jan. 10, 2007) ........21

*Healy v. James*,
408 U.S. 169 (1972)...................................................................................21

*K.A. v. Pocono Mt. Sch. Dist.*,
710 F.3d 99 (3d Cir. 2013)..........................................................................37

*Korematsu v. United States*,
323 U.S. 214 (1944)..............................................................................1

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993)............................................................................32

*Mathews v. Lucas*,
427 U.S. 495 (1976)............................................................................28

*NAACP v. Ala.*,
377 U.S. 288 (1964)............................................................................25

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958)......................................................................21, 23

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015)........................................................................32

*Reilly v. City of Harrisburg*,
336 F. Supp. 3d 451 (M.D. Pa. 2018).................................................36

*Roberts v. Neace*,
958 F.3d 409 (6th Cir. 2020) .............................................................23

*Roberts v. United States Jaycees*,
468 U.S. 609 (1984)............................................................................22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)............................................................................32

*Salvation Army v. Dep't of Cmty. Affairs*,
919 F.2d 183 (3d Cir. 1990)...............................................................21

*Statharos v. N.Y.C. Taxi & Limousine Comm'n*,
198 F.3d 317 (2d Cir. 1999)...............................................................36

*Trump v. Haw.*,
138 S. Ct. 2392 (2018)..........................................................................1

*Union P. R. Co. v. Botsford*,
141 U.S. 250 (1891) ...................................................................................33

*United States v. Husband*,
226 F.3d 626 (7th Cir. 2000) .....................................................................34

*United States v. Mendenhall*,
446 U.S. 544 (1980) ...................................................................................26

*United States v. O'Brien*,
391 U.S. 367 (1968) ...................................................................................30

*United States v. Traitz*,
807 F.2d 322 (3d Cir. 1986) .......................................................................26

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................21

*Wooley v. Maynard*,
430 U.S. 705 (1977) ...................................................................................29

*Zinermon v. Burch*,
494 U.S. 113 (1990) ...................................................................................28

## <u>Statutes</u>

28 Pa. Code § 27 ........................................................................................14

## INTRODUCTION

While the fear engendered by war or pandemic might lead politicians, their attorneys, and yes, even judges of the highest order, to assert that patent violations of the Constitution are not what they appear to be, and that even if they were what they appear to be, in these times of danger the public safety interest demands an exception to our most fundamental liberties, history teaches that we will look back on these arguments as "gravely wrong . . . overruled in the court of history . . . and . . . [having] no place in law under the Constitution." *Trump v. Haw.*, 138 S. Ct. 2392, 2423 (2018) (repudiating *Korematsu v. United States*, 323 U.S. 214 (1944)).  We would like to think that this Court will not wait for history.  *See Cnty. of Butler v. Wolf*, No. 2:20-cv-677, 2020 U.S. Dist. LEXIS 167544, at *25, 31 (W.D. Pa. Sep. 14, 2020), *stayed pending appeal*, No. 20-2936 (3d Cir. Oct. 1, 2020) (noting "the importance of an independent judiciary in a crisis," and stating that "the response to a pandemic (or any emergency) cannot be permitted to undermine our system of constitutional liberties or the system of checks and balances protecting those liberties. . . .").

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on September 3, 2020.  (Doc. No. 1).  All parties were served, and all counsel have appeared.  (Doc. Nos. 5, 7, 8, 9-11).  Defendants must respond to the Complaint by November 9, 2020.  (Doc. No. 13).

# STATEMENT OF FACTS[1]

## I.    Defendant Wolf's Assertion of "Emergency Powers."

On March 6, 2020, Defendant Wolf issued a Proclamation of Disaster Emergency, thereby invoking his "emergency powers" and allowing him to act without any checks or balances to his power. The basis for the invocation of these extraordinary powers was the threat of a COVID-19 pandemic in the state. Defendant Wolf has since twice extended his "emergency powers" for 90 days (on June 3, 2020, and again more recently on August 31, 2020). The General Assembly is without power to stop him.[2]  (Redman Decl. ¶¶ 5, 15, 78).

As the factual record in *County of Butler v. Wolf* revealed, Defendant Wolf has no plan to relinquish his "emergency powers":

> [T]estimony and evidence presented by Defendants does not establish any specified exit gate or end date to the emergency interventions. Rather, the record shows that Defendants view the presence of disease mitigation restrictions upon the citizens of Pennsylvania as a "new normal" and they have no actual plan to return to a state where all restrictions are lifted. It bears repeating; after six months, there is no

---

[1] Declaration of Mark Redman ("Redman Decl.") is attached as Exhibit 1. Declaration of Chad Parker ("Parker Decl.") is attached as Exhibit 2. Declaration of Rebecca Kenwick-Parker ("Kenwick-Parker Decl.") is attached as Exhibit 3.

[2] On May 28, 2020, the General Assembly passed House Resolution 836, which sought to terminate the governor's emergency powers. Following a 4-3 decision by the Pennsylvania Supreme Court requiring presentation of the resolution for signature, the governor vetoed the resolution on July 14, 2020. In his veto message, Defendant Wolf stated, "At some point, we will be ready as a Commonwealth to move past the disaster emergency currently challenging us. But that day is unfortunately not yet here." There is no such day on the horizon. (Redman Decl. ¶¶ 11, 16).

plan to return to a situation where there are no restrictions imposed upon the people of the Commonwealth.

*Cnty. of Butler*, No. 2:20-cv-677, 2020 U.S. Dist. LEXIS 167544, at *26-27.

In the early months of the declared pandemic, Defendant Wolf issued various restrictions pursuant to his "emergency powers." At that time, Plaintiffs were told that the restrictions were required to ensure that the hospitals were not overrun and to "flatten the curve." Plaintiffs were willing to cooperate given this explanation and what certainly appeared to be a short-term situation. Both conditions were met, yet restrictions on freedom continue. (Redman Decl. ¶¶ 7-8; Parker Decl. ¶ 5).

## II.    The Contact Tracing Program.

On June 19, 2020, the Pennsylvania Department of Health ("DOH") announced that more than 4,000 close contacts of COVID-19 cases have been identified and monitored to date through the contact tracing efforts of 500 trained contact tracers throughout the state. Defendant Levine remarked that DOH is "now equipped with hundreds of contact tracers." (Redman Decl. ¶ 21).

According to DOH, "[c]ontact tracing is the process of identifying, notifying, and monitoring anyone who came in close contact with an individual who tested positive for COVID-19 while they were infectious."[3] (*Id.* ¶ 24). "A case

---

[3] There are serious flaws with the testing for COVID-19. On May 20, 2020, it was revealed that several states, including Pennsylvania, were combining the results from viral and antibody COVID-19 tests when reporting the testing totals, despite marked differences between the tests. The combining of the tests leads to the skewing of the

investigation is the identification and investigation of patients who are classified as being a confirmed or *probable* case of COVID-19.  Contact tracing is the subsequent *verification*, *monitoring*, and support of their contacts who have been exposed to and *possibly* infected with the virus."  (*Id*. ¶ 27) (emphasis added).  "Within 24 hours of receiving the positive result, trained public health staff conduct an interview with the case *to obtain a list of close contacts* they had while infectious. . . .  The cases are encouraged to utilize calendars, social media, etc. to remember where and who they were around during their infectious period.  During the case investigation, the public health staff attempt to obtain as much information as possible on the contacts (address, phone, email, etc.) and then share the contact information with the designated contact tracers."  All of this information is then compiled and retained in a government database.  (*Id*. ¶ 35).

As stated by DOH, "During the case investigation, public health professionals spend 30 to 60 minutes asking questions to ensure all potential close contacts are

---

overall positivity rate of the tests.  In addition, states were including "probable cases" in the overall case count without distinguishing between a confirmed case and a probable case.  And the criteria for counting a "case" is constantly changing.  For example, on August 29, 2020, DOH announced the following: "Persons with a positive antibody (serology) test, moving forward, will no longer be considered a probable case.  However, cases previously counted as probable cases, using the prior national case definition, will remain counted as probable cases."  The New York Times reported on August 29, 2020, that there are significant problems with COVID-19 test results, noting that "[t]he standard tests are diagnosing huge numbers of people who may be carrying relatively insignificant amounts of the virus."  (Redman Decl. ¶¶ 18-20, 33-34, 64).

identified.  They collect information about who the case came in contact with and where they went while they were infectious."  (*Id*. ¶ 39).

Pursuant to the contact tracing program, private citizens and their closest associates, including family members, are ordered to quarantine for 14 days under burdensome conditions and threats of further adverse consequences for failing to comply with the program.  (Parker Decl. ¶¶ 13-21).  Pursuant to the program, "cases" are required to disclose close associations, which would include family members, friends, fellow church worshipers, business associates, political associates, and essentially anyone the "case" has associated with during the alleged period of "infection."  (Redman Decl. ¶¶ 35-37, 51; Parker Decl. ¶¶ 14, 15-16, Ex. B).

Since July of this year, DOH has been ramping up its contact tracing program:

•  On July 10, 2020, DOH received emergency approval to spend nearly $2 million for the development of a smartphone contact tracing app;

•  On July 17, 2020, DOH received emergency approval to spend $25 million to recruit, hire, and train 4,000 contact tracers in 90 days;

•  On July 22, 2020, DOH issued a press release confirming that it is expanding its contact tracing resources and stating, "Our estimates show that the state needs about 625 contact tracers.  However, this number could grow hundreds, even thousands, depending on the resurgence of COVID-19 in the fall."  DOH concludes by stating, "Between June 29 and July 13, contact tracers have enrolled

3,638 contacts in the Sara Alert system.  The Sara Alert, working alongside our disease surveillance system (NEDSS), offers contact tracers the ability to track, monitor, isolate and test symptomatic contacts and is further enhanced by the use of technology applications.  This web-based monitoring tool enable[s] contact tracers to send daily emails, texts and/or phone calls to cases and identified close contacts throughout their isolation/quarantine monitoring period";

- On July 23, 2020, DOH posted a Request for Expression of Interest ("RFEI") on the Commonwealth's eMarketplace portal, seeking "expressions of interests" from firms to "implement a Contact Tracing Management System."  The materials describing this RFEI show that this is in fact the creation of a massive and permanent database that will be used to surveil the population of Pennsylvania;

- On July 31, 2020, DOH announced that it intended "to recruit, hire, train, and support 1,000 paid contact tracing staff to further COVID-19 contact tracing efforts" in the state.  This is "an additional 1,000 contact tracing staff to the 654 contact tracers across the state currently";

- On August 4, 2020, DOH posted Request for Application ("RFA") 67-116 on the Commonwealth's eMarketplace portal.  RFA 67-116 seeks to spend $60,000,000 on "hub and spoke" COVID-19 testing.  The bid documents indicate that the contract will run through *June 30, 2022*, and that the objective is to test 5% of the population every month, which is approximately 640,000 people.  This "hub

and spoke" rapid testing will lead to more contact tracing and surveillance of private citizens with no regard for the fact that it is not necessary;

- On September 22, 2020, Defendants Wolf and Levine held a press conference announcing the launch of the contact tracing app, COVID Alert PA, and asked every Pennsylvanian to download it.  (Redman Decl. ¶¶ 22-32).

As part of the contact tracing program, restaurants are "**encouraged**" (bold in the original) to "utilize reservations for dining on premises to maintain records of all appointments, including contact information for all customers."  Similarly, salons and barbershops are required to conduct business by appointment only.  (*Id*. ¶¶ 36-37).

DOH, in conjunction with the Pennsylvania Department of Education, directly implements and enforces the contact tracing program within the schools.  To more effectively implement the program, DOH requires each school to "[t]ake measures that allow for exposed individuals to be more easily traced," including, the "[u]se of assigned seating for each class," "tak[ing] attendance for every class and including all individuals (staff and contractors) who were in the classroom," "us[ing] sign-in sheets for in-person meetings to document staff attendees," and "keep[ing] accurate records of any persons other than students and staff that enter the building, their reason for being there, the locations in the building they visit, and the names of close contacts they visit in the building."  (*Id*. ¶ 38).

These expenditures and efforts result in a tracing and surveillance infrastructure that is qualitatively different than traditional contact tracing.  Even after the COVID-19 pandemic subsides, this infrastructure will be available for use at any time, and it imposes restrictions on liberty without evidence of sickness.  (*See infra* sec. IV.).

## III.   The Mask Mandate.

On July 1, 2020, Defendant Levine issued an order mandating "universal face coverings," thereby requiring all persons in Pennsylvania to wear a face mask when leaving their home ("mask mandate").  (Redman Decl. ¶¶ 53-54).

For many individuals, including Plaintiffs, a face mask has become a symbol of oppression and an attempt by the government to control the citizenry during this current pandemic.  This view was expressed by a political cartoon published in the Wall Street Journal:



(Redman Decl. ¶ 55; Parker Decl. ¶ 7; Kenwick-Parker Decl. ¶ 7).   Indeed,

politicians, including Defendant Wolf, know that wearing a mask is "political theater." (Redman Decl. ¶ 56).

The mask mandate presumes, and thereby conveys the message, that all people are diseased and thus makes the wearer contribute to a false public statement that all people are in fact diseased. For Plaintiffs, forcing them to wear a face mask is forcing them to convey a message with which they disagree. Because a mask has become a political symbol during this politicized pandemic, the wearing of a mask is a form of symbolic speech. Consequently, via the mask mandate, Defendants are compelling Plaintiffs to engage in a form of expression and to convey a message with which they disagree. (Redman Decl. ¶¶ 57-59; Parker Decl. ¶¶ 8-10; Kenwick-Parker Decl. ¶¶ 8-10).

Plaintiffs also object to the mask mandate because it violates their privacy interests, including their right to bodily integrity and personal autonomy free from government interference. (Redman Decl. ¶ 60; Parker Decl. ¶ 11; Kenwick-Parker Decl. ¶ 11).

A mask is required for everyone, even though the vast majority of individuals are healthy or are not in a high-risk group. And while science and data show that the vast majority of Americans are healthy (80% to 90% do not have COVID or a comorbidity that would make them susceptible to COVID), the mask mandate

presumes that all citizens are diseased unless proven healthy.[4]  The mask mandate is forcing every Pennsylvanian, including Plaintiffs, to become the government's patient without the citizen's consent.   (Redman Decl. ¶ 61; Parker Decl. ¶ 12; Kenwick-Parker Decl. ¶ 12).

In fact, pursuant to the government's COVID-19 data available as of September 22, 20202, the percentages are shockingly low.   The population of Pennsylvania is approximately 12.8 million.   The number of COVID-19 cases (confirmed *and* probable to give the government the benefit of the doubt) in Pennsylvania is 151,646.   The total number of deaths is 8,023.   Accordingly, the percentage of people in Pennsylvania with confirmed or probable COVID-19 is only 1.18% of the population.   The death rate is far less—it is .0626% of the population. (Redman Decl. ¶¶ 62-65).

The mask mandate also creates conflict and division during this politically-charged election year.   The mandate is a way in which political leaders, such as Defendant Wolf, can promote the narrative that this declared pandemic is far worse than what it really is.  Defendants further exacerbate the division caused by the mask mandate by establishing a "snitch line" that allows someone to report directly to

---

[4] An exception to the mask mandate is provided for "those with respiratory issues that impede breathing."   In other words, masks are not required to be worn by individuals who are most susceptible to COVID-19, a virus that attacks the respiratory system.  (Redman Decl. ¶ 53, Ex. U).

DOH perceived violations of the mask mandate or other COVID-related restrictions. Complaints can be made directly online as well. Defendants also use media (traditional and social) to publicly shame those who oppose wearing masks. (Redman Decl. ¶¶ 66-70).

Science and data do not support the mask mandate. A study posted on the Centers for Disease Control's ("CDC") website in May 2020, concluded, *inter alia*, that "[t]here is limited evidence for their effectiveness in preventing influenza virus transmission either when worn by the infected person for source control or when worn by uninfected persons to reduce exposure. Our systematic review found no significant effect of face masks on transmission of laboratory-confirmed influenza." (*Id.* ¶ 71). The continuation of the mask mandate also ignores the declining death rate. The pandemic has changed, but the public policy responses have not.

On August 17, 2020, Defendants also ordered that all students attending primary and secondary schools must wear masks, even if social distancing can be maintained. However, according to DOH, children ages 0-19 make up less than 8% of total confirmed and presumed positive COVID-19 cases. DOH does not list any deaths in this age demographic. Further review of DOH data shows that the COVID-19 virus is more serious for the elderly population, not for students. (*Id.* ¶ 72).

The wearing of masks can have negative consequences for the wearer. This fact was established in a paper published in March of this year by the Journal of

Infectious Diseases and Epidemiology.  The paper was based on a survey of 343 frontline healthcare workers in New York City responding to the first wave of COVID-19.  (*Id.* ¶ 73).

## IV.   Harm to Plaintiffs.

On July 14, 2020, Plaintiff Parker believed he had a sinus infection and so he sought medical treatment.  On July 19, 2020, he was tested for COVID-19, and on July 24, 2020, his test came back positive.  Plaintiff Parker works for a state government employer, which follows the CDC guidance for when a person who tests positive for COVID-19 is cleared to return to work.  Pursuant to that guidance, Plaintiff Parker was cleared on July 24, 2020, and *he returned to work on July 25, 2020*.  (Parker Decl. ¶ 13).

On July 25, 2020, Plaintiff Parker was contacted by a contact tracer pursuant to the contact tracing program.  The contact tracer asked probing questions, including the identity and ages of those living with Plaintiff Parker, the names of any businesses or other places he recently visited, and the names and contact information of any people he recently visited or had contact with.  The Parkers were disturbed by the intensive questioning by this government investigator and by the investigation itself, which sought personal and private information regarding their personal and private contacts and associations.  (*Id.* ¶ 14).

Shortly following the probing phone call with the contact tracer, the Parkers

received a letter in the mail from DOH dated July 25, 2020 ("DOH Letter").  (*Id*. ¶ 15, Ex. B).

The DOH Letter was addressed to the "Parker/Kenwick Family."  The letter made explicit that "[t]he Secretary of Health is *directing* you as a close contact of a person that has COVID-19 to self-quarantine in your home."  (emphasis added).  The letter states that "[t]his authority is granted to the Secretary of Health under the law," citing as authority, *inter alia*, various sections of the Disease Prevention and Control Law and DOH regulations found at 28 Pennsylvania Code Chapter 27.  (*Id*. ¶ 16).

During the mandated, 14-day quarantine (house arrest), the DOH Letter also "directed" the Parkers to, *inter alia*, "[m]aintain social distancing of at least 6 feet *from family members*" and to "[c]ooperate with the monitoring and other contacts of the Department or its representatives."  In other words, Plaintiffs Chad Parker and Rebecca Kenwick-Parker had to remain separated from each other by 6 feet for 14 days, and they had to remain separated from their minor children by 6 feet for 14 days.  (*Id*. ¶ 17; Kenwick-Parker Decl. ¶ 17).

The DOH Letter concludes with a stern warning: "You must immediately adhere to this quarantine directive and all disease control measures included in it.  If you do not cooperate with this directive, the Secretary of Health may petition a court to have you *confined* to an appropriate place chosen by the Department. . . .  This may be a hospital, or some other appropriate place, *whichever the Department*

*determines is best suited for your case.  You will be kept there until the Department determines it can release you from quarantine.  Law enforcement may be called upon, to the extent necessary, to ensure your compliance with this directive*." (Parker Decl. ¶ 18) (emphasis added).

Pursuant to 28 Pennsylvania Code Chapter 27, a violation of DOH directives as set forth in the DOH Letter could result in criminal penalties (§ 27.8).  Chapter 27 also gives DOH very broad, plenary, and punitive powers to enforce the contact tracing program.  For example, DOH has the power, *inter alia*, to:

- isolate, quarantine, segregate, and surveil individuals without a warrant or consent (§ 27.60(a));

- define the conditions of the quarantine (§ 27.65);

- put a placard/sign in front of a person's home if DOH believes that the person is not "fully" compliant (§ 27.66);

- restrict physical movement, requiring the quarantine to "take place in an institution where the person's movement is physically restricted" (§ 27.88(a));

- "treat" minors without parental consent (§ 27.97);

- isolate a person if he or she refuses treatment (§ 27.87(a));

- enter a home without a warrant or consent (§ 27.152(b)); and,

- review confidential medical records without a warrant or consent (§ 27.152(c)).

Indeed, DOH has the authority to remove minor children from their homes and place them in an isolated quarantine location without parental consent pursuant to the contact tracing program.  (Redman Decl. ¶ 44).

At all relevant times, the Parkers, including their children, lived in close contact with each other in the same household.  Accordingly, their exposure to COVID-19 via Plaintiff Parker had begun well before July 14, 2020, and yet none of the family members demonstrated any symptoms.  Nonetheless, the Parkers and their children were forced to quarantine (house arrest) for 14 days *beginning* on July 25, 2020.  (Parker Decl. ¶ 19).

There was no process in place to challenge this forced quarantine nor were Defendants required to demonstrate probable cause that it was necessary.  Indeed, it was *not* necessary as the period of infection had expired prior to the imposed quarantine period.  (*Id*. ¶ 20).

From July 25, 2020, to on or about August 24, 2020, Plaintiff Parker received approximately 14 texts a day from DOH.  The text messages required responses to a "Daily Self-Report."  There was no way to stop the incessant messages, which were apparently generated by the Sara Alert system.  Pursuant to the DOH Letter, the Parkers were required to "cooperate" and thus respond.  (*Id*. ¶ 21).

Because the Parkers are now in Defendants' contact tracing database, they reasonably fear that they will be subjected once again to a quarantine.  At a

minimum, they object to being subjected to surveillance, having their personal medical records reviewed by DOH, and being in the government's database. (*Id.* ¶ 22; Kenwick-Parker Decl. ¶ 22).

Plaintiff Kenwick-Parker homeschools her three biological children, giving them the option to attend public school once they reach the 8th grade. Plaintiff Kenwick-Parker's 14-year-old son (her oldest biological child) attended public school last year (8th grade) and was planning on attending public high school (9th grade) this year (2020). However, due to the contact tracing program and the mask mandate, the Parkers were forced to keep him home, causing them to scramble to find a high school curriculum for homeschooling and thus incurring additional costs for that curriculum as well. So long as the contact tracing program and mask mandate remain in effect, the Parkers will not send Plaintiff Kenwick-Parker's biological children to public school. (Kenwick-Parker Decl. ¶ 23).

The Redman's two children are 11th grade students at Delaware Valley High School in Pennsylvania. School opened on September 2, 2020. (Redman Decl. ¶ 46).

Because of the challenged contact tracing program, particularly as it will apply in the public schools, the Redmans are being forced to have their children attend school remotely rather than attending in person. The risk of having their children subjected to the oppression and penalties associated with the challenged contact

tracing program while attending a public school is too great.  (*Id*. ¶ 47).

The Redman's children will be at a disadvantage by not attending school in person.  They will not have the benefit of socializing with their peers—an important factor for young people, especially teens.  They will not have the advantage of interacting personally with their teachers or being present in classes such as laboratory science where a student's presence is important.  And they will have the stigma of being at home and present only in a virtual sense.  (*Id*. ¶ 48).

The Redmans decision not to send their children to school was a very difficult decision, but they had no choice.  These boys in particular are especially affected because of special requirements where an in-person school environment is important and beneficial.  One child, for example, has an individualized education plan.  The Redmans also object to the forced wearing of masks throughout the entire school day, even when social distancing could be achieved.  (*Id*. ¶ 49).

Prior to the implementation of the contact tracing program, the Redmans used Life360—a smartphone application that allowed them to track the whereabouts of their children.  However, because of the challenged contact tracing program, the Redmans do not want to have any data or information available that Defendants may seize to quarantine not only their children, but also others with whom they associate. The Redmans have also purposely deactivated updates to their cell phones to avoid the unwanted installation of tracking and surveillance software.  Despite these efforts

to avoid government surveillance, COVID-19 software was installed on several phones.  (*Id.* ¶ 50).

As a result of the COVID-19 restrictions, the Redman's usual house of worship requires pre-registration in order to attend in-person services within the church.  Because of the challenged contact tracing program, the Redmans have curtailed attending religious services to avoid providing data or information that Defendants may acquire or seize to quarantine them, their children, or others with whom they associate.  (*Id.* ¶ 51).

Because of the contact tracing program, Plaintiffs will avoid seeking medical treatment (particularly in light of what happened to the Parkers as a result of Plaintiff Parker seeking treatment for what he believed was a simple sinus infection), and they will avoid businesses, restaurants, and other public or social events that may keep rosters, lists, video or other ways to document persons who entered the business establishment or attended the event.  (*Id.* ¶¶ 51-52; Parker Decl. ¶ 24; Kenwick-Parker Decl. ¶ 24).

Because of the challenged contact tracing program and mask requirement, Plaintiffs are suffering and will continue to suffer irreparable harm.  (Redman Decl. ¶ 80; Parker Decl. ¶ 25; Kenwick-Parker Decl. ¶ 25).

## V.    Science and Data Do Not Support Defendants' Restrictions.

Defendants consistently assert that the restrictions they have imposed upon

the fundamental liberties of Pennsylvanians are based on science and data, yet they refuse to provide the evidence they purportedly rely upon.  Further, the evidence adduced in *County of Butler v. Wolf* suggests that the process of developing restrictions in response to the declared pandemic was arbitrary and capricious. (Redman Decl. ¶ 75).

The CDC daily publishes numbers on their website reflecting the total number of COVID-19 cases in the United States and the total number of COVID-19 deaths. While this number changes daily, a snapshot of the numbers on August 23, 2020, reveals a fatality rate of 3% based on reported numbers.  However, repeated studies done in multiple countries (including CDC studies done in the United States) indicate that the actual infection rate is estimated to be between 10 and 110 times the reported infection rate, with the average being between 20 to 25 times.  This means that the fatality rate is very likely closer to .12% to .15%.  And among these deaths, it is known that most of them are from people who are elderly and/or already have comorbidity factors, and a significant number of reported deaths are from when COVID-19 patients were placed in nursing homes among vulnerable populations. COVID-19 related deaths in nursing homes account for about 70% of all coronavirus deaths in Pennsylvania, a number that was exacerbated by Defendant Levine's order to place active COVID-19 patients into nursing homes.  (*Id*. ¶ 76).

According to a recent CDC report, just *six percent* of coronavirus deaths have

"COVID-19" as the only cause mentioned, revealing that *94 percent* of those who died from coronavirus also had other "health conditions and contributing causes." And, as noted above, the percentage of people in Pennsylvania with confirmed or *probable* COVID-19 is only 1.18% of the population. And the death rate is far less— it is .0626% of the population. (*Id.* ¶¶ 62-64, 77, 79). In other words, science and data do not justify Defendants' broad suspension of fundamental liberties for all Pennsylvanians.

## QUESTIONS INVOLVED

1.     Does the contact tracing program violate the First, Fourth, and Fourteenth Amendments?

2.     Does the mask mandate violate the First and Fourteenth Amendments?

3.     Should a preliminary injunction issue when (a) Plaintiffs have demonstrated a strong likelihood of success on their constitutional claims, (b) Plaintiffs are suffering irreparable harm, (c) the balance of equities favors granting an injunction, and (d) granting the injunction is in the public interest?

## ARGUMENT

## I.     Standard for Issuing a Preliminary Injunction.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008); *Fulton v. City of Phila.*, 922 F.3d 140, 152 (3d Cir. 2019) (same);

*see also AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir.

1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success

on the merits and irreparable injury, it almost always will be the case that the public

interest will favor the plaintiff.").

## II.  Likelihood of Success on Constitutional Claims.

### A.  Contact Tracing Program.

#### 1.  First and Fourteenth Amendments—Right to Association.

"Among the rights protected by the First Amendment is the right of

individuals to associate to further their personal beliefs."  *Healy v. James*, 408 U.S.

169, 181 (1972).  The Third Circuit adopted this fundamental understanding, stating,

> It is beyond debate that freedom to engage in association for the
> advancement of beliefs and ideas is an inseparable aspect of the
> "liberty" assured by the Due Process Clause of the Fourteenth
> Amendment, which embraces freedom of speech.  Of course, it is
> immaterial whether the beliefs sought to be advanced by association
> pertain to political, economic, religious or cultural matters, and "*state
> action which may have the effect of curtailing the freedom to associate
> is subject to the closest scrutiny.*"

*Salvation Army v. Dep't of Cmty. Affairs*, 919 F.2d 183, 197 (3d Cir. 1990) (quoting

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958)) (emphasis added);

*Grove v. City of York*, No. 1:05-CV-02205, 2007 U.S. Dist. LEXIS 1837, at *40

(M.D. Pa. Jan. 10, 2007) ("The close nexus between these rights is also evidenced

by the fact that an individual's freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

This right of association protects two distinct aspects of association: "In one aspect, it protects an individual's choice to enter into and maintain certain intimate human relationships, which is a fundamental element of personal liberty.  Its other aspect recognizes a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Fraternal Order of Police, Lodge No. 5 v. City of Phila.*, 812 F.2d 105, 119 (3d Cir. 1987) (internal quotation marks, alterations, and citations omitted).  And the right of individuals to associate as a family without government interference is paramount.  *See Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984) (stating that "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life" which has "led to an understanding of freedom of association as an intrinsic element of personal liberty").

As stated by the Supreme Court, "state action which *may have the effect of curtailing* the freedom to associate is subject to the *closest scrutiny*." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. at 460-61 (emphasis added). The contact tracing program has "the effect of curtailing the freedom to associate." In fact, this is a primary effect of the program—an effect felt by Plaintiffs in a very real way, causing them to curtail their freedom and private associations because of its existence. Accordingly, the program must satisfy strict scrutiny ("closest scrutiny"), and it plainly cannot. *See, e.g., Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) ("All of this requires the [pandemic] orders to satisfy the strictures of strict scrutiny. They cannot.").

The contact tracing program grants the government extraordinary power to impose draconian restrictions on individuals that infringe upon their fundamental liberties and private associations. Through this program, the government uses its authority to inquire into and search out the private associations of individuals. The breadth of government power under this program is forcing Plaintiffs to keep their children from attending public schools in person; to avoid seeking medical treatment; and to avoid businesses, restaurants, and other public or social events that may keep rosters, lists, video or other ways to document persons who entered the business establishment or attended the event. The program is also forcing the Redmans to avoid worship services. Moreover, in the case of the Parkers, it required them to maintain social distancing among family members living in the same

household.  Because the program curtails the freedom of association, it must satisfy strict scrutiny.

"Under strict scrutiny the government faces a more difficult burden, it must show that the regulation is *necessary* to serve a *compelling* state interest, and the regulation must be the *least restrictive means* of achieving the interest."  *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 140 n.167 (3d Cir. 2020) (internal quotations and citations omitted) (emphasis added).  This is "the most demanding test known to constitutional law."  *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

As evidenced by the way in which the contact tracing program was enforced against the Parkers, the program cannot survive this "most demanding test."  While the government has a substantial (some would argue compelling) interest in protecting public health against the virus, the contact tracing program is not "necessary" nor the "least restrictive means" of doing so.  As the facts involving the Parkers demonstrate, the threat of spreading the virus among family members had already dissipated by the time the quarantine was ordered (indeed, Plaintiff Parker had already been cleared to return to work by his state government employer).  There was no determination made by the government (nor any effort or requirement to make such a determination) that: (1) the "positive" test of Plaintiff Parker was accurate or properly administered; (2) that Plaintiff Parker was infectious (which he

obviously was not); (3) that any of the Parkers were infectious (or had antibodies for that matter); (4) that anyone was, in fact, ill (none of them were); (5) that anyone posed a threat of spreading the virus (they didn't); or (6) that anyone was a member of the demographic mostly likely to need hospitalization (none of them were). Yet, the entire Parker family was placed under house arrest subject to burdensome restrictions without the government having to justify its actions in any way.

The Constitution requires the government to regulate with precision. As stated by the Supreme Court:

> In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," . . . and must be "tailored" to serve their legitimate objectives. . . . And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means."

*Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *see also Aptheker v. Sec. of State*, 378 U.S. 500, 508 (1964) ("Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.") (quoting *NAACP v. Ala.*, 377 U.S. 288, 307-08 (1964)).

Here, Defendants are regulating with the blunt force of a sledgehammer rather than the precision of a scalpel. The program is unconstitutional.

### 2.      Fourth and Fourteenth Amendments.

The quarantine mandated by the contact tracing program is the equivalent of a house arrest.  *See generally United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986) (noting that when the defendant is required to "abide by specified restrictions on his personal associations, place of abode, or travel," this is a "house arrest").  It severely restricts the liberty of individuals who have committed no crimes.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (stating that a Fourth Amendment "seizure" occurs when "a reasonable person would have believed that he was not free to leave"); *Gallo v. City of Phila.*, 161 F.3d 217, 224, 225 (3d Cir. 1998) (noting that the Third Circuit has adopted "a broad approach in considering what constitutes a seizure," concluding "that the combination of restrictions imposed upon Gallo, because they intentionally limited his liberty, constituted a seizure").  Indeed, it restricts the liberty of individuals who are not even ill.

As stated by the court in *County of Butler* regarding the lockdown order held unconstitutional—an order which lacked the same constitutional safeguards as the contact tracing program challenged here:

> Even if the lockdown effectuated by the stay-at-home order could be classified as a quarantine, it would nevertheless far exceed the traditional understanding of a state's quarantine power.   State quarantine power, "although broad, is subject to significant constitutional restraints."  Wendy E. Parmet, *Quarantining the Law of Quarantine: Why Quarantine Law Does Not Reflect Contemporary Constitutional Law*, 9 WAKE FOREST J.L. & POLY 1, 4 (2018).  The power to subject a citizen to quarantine is subject to both procedural

and substantive due process restraints."  At a minimum, these include the requirement that quarantine be imposed *only when it is necessary for public health* (or is the least-restrictive alternative) and *only when it is accompanied by procedural due process protections*, including notice, the right to a hearing before an independent decision-maker either before or shortly after confinement, the right to counsel, and the requirement that *the state prove its case with clear and convincing evidence*." *Id.* at 4 (internal citations omitted).  Defendants' stay-at-home orders imposed a statewide lockdown on every resident of the Commonwealth that included none of these basic constitutional safeguards.

*Cnty. of Butler*, No. 2:20-cv-677, 2020 U.S. Dist. LEXIS 167544, at *63 n.20 (emphasis added).  Similarly, Defendants' contact tracing program imposes lockdowns that include none of these basic constitutional safeguards,[5] in violation of the Fourth and Fourteenth Amendments.

In addition to lacking any procedural safeguards, the program violates substantive Due Process.  Indeed, the social distancing requirement imposed *upon family members living in the same household* (as the case of the Parkers) further illustrates and exemplifies this violation.  *See, e.g., Griswold v. Conn.*, 381 U.S. 479, 485-86 (1965) ("Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of [close contact between spouses in violation of social distancing mandates]?  The very idea is repulsive to the notions of privacy surrounding the marriage relationship.").

---

[5] It's not possible to address whether pre- or post-deprivation processes are adequate, *see, e.g., Benner v. Wolf*, No. 20-cv-775, 2020 U.S. Dist. LEXIS 89425, at *9 (M.D. Pa. May 21, 2020), because neither exists.

Additionally, "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotations omitted). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, . . . it serves to prevent governmental power from being used for purposes of oppression." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (internal citation and quotations omitted). As stated by the Supreme Court, "We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, . . . whether the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal citations and quotations omitted). The challenged program fails here as well. *See generally Cnty. of Butler*, 2020 U.S. Dist. LEXIS 167544, at *83 (citing *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)) (stating that "[e]ven with this forgiving [rational basis] standard as its guide, the Court nevertheless holds that the March 19, 2020 Order closing all 'non-life-sustaining' businesses was so arbitrary in its creation, scope and administration as to fail constitutional scrutiny").

Here, as outlined above, the contact tracing program is so arbitrary in its creation, scope, and administration that it fails any level of constitutional scrutiny.

**B.    Mask Mandate.**

The right to freedom of speech includes the right not to speak.  And the free speech right includes symbols as a form of expression.  Additionally, the Fourteenth Amendment protects our personal autonomy and bodily integrity from government interference.  The mask mandate fails constitutional scrutiny under the First and Fourteenth Amendments.

**1.    First Amendment.**

In *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), a case in which the government prohibited individuals from covering the State motto on their license plates, the Court held that the First Amendment is implicated when the government requires an individual to

> use their private property as a "mobile billboard" for the State's ideological message—or suffer a penalty . . . . As a condition to driving an automobile—a virtual necessity for most Americans—the [plaintiff] must display "Live Free or Die" to hundreds of people each day.  The fact that most individuals agree with the thrust of New Hampshire's motto is not the test; most Americans also find the flag salute acceptable.  The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable.

*Id*. at 715.  Accordingly, compelled speech, such as the government's mandate to wear what has become a political symbol in a highly-politicized pandemic, implicates the right to freedom of speech.  Defendants are forcing Plaintiffs to use their bodies as "mobile billboards" for their pandemic message in violation of the

First Amendment.  Indeed, Defendants are forcing Plaintiffs to participate in their "political theater."

In *United States v. O'Brien*, 391 U.S. 367, 376 (1968), a case in which the defendant was advancing a First Amendment challenge to his conviction for burning his draft card, the Court stated "that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  The Court held that the statute prohibiting the destruction of draft cards was constitutional both on its face and as applied.  *Id*. at 382.  *O'Brien* is inapposite.  It was not a compelled speech case.  It involved a statute that was designed to protect government-issued certificates that were necessary for the proper functioning of the Selective Service.  The statute did not infringe on the personal autonomy and bodily integrity of individuals.  It didn't mandate an individual to purchase or construct an item (such as a face covering).  And as the Court noted, "We perceive no alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their willful mutilation or destruction."  *Id*. at 381.  Here, assuming face masks are as effective as Defendants allege (and they are not),[6] an

---

[6] The fact that almost anything will suffice as a "face covering" and the fact that there is no requirement that the covering be of any medical grade or particular quality (in fact, Defendants discourage the use of medical protective equipment so as to

alternative and more narrow means of accomplishing the government's alleged interest is to limit the requirement to those who are positively infected or who are the most susceptible (elderly or persons with comorbidities).  The mask mandate does not survive under *Wooley* or *O'Brien*.

On June 3, 2020, Defendant Wolf, in an admitted violation of his own executive orders, marched in a Black Lives Matter ("BLM") protest.  Defendant Wolf joined hundreds of demonstrators as they marched through Harrisburg, Pennsylvania to protest the police killing of George Floyd—some of the protestors were not wearing masks and social distancing was not practiced.  Defendant Levine defended Defendant Wolf's actions, claiming that regardless of the pandemic order, "people have the right to protest, and to demonstrate, and the right to free speech." Defendant Levine stated further that Defendant Wolf is "not restricting people's right to protest," adding that "[t]here are all obviously significant social issues that are present, that people feel that they need to have a voice, and so the governor is always supportive of that and is participating."  (Redman Decl. ¶ 12).  Here, Plaintiffs feel the "need to have a voice" by <u>not</u> wearing the mandated mask in public.  Defendants are willing to overlook the potential spreading of this virus via *mass* BLM public protests because they consider the message to be about

reserve the equipment for health workers) further demonstrate the ineffectiveness of the mandate and thus further undermine the government's alleged interest.

"significant social issues." Plaintiffs' protest is similarly about a significant social issue—the protection of liberty from government tyranny. Allowing one protest message (with attendant dangers of spreading the virus), but prohibiting Plaintiffs' protest (with an *alleged* danger of spreading the virus) is a viewpoint-based restriction—the most egregious form of content discrimination.

"The principle that has emerged from [Supreme Court] cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (internal quotations and citation omitted); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination."). The mask mandate cannot survive strict scrutiny. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("Content-based laws . . . are presumptively unconstitutional."). The exemption allowed for BLM protests (protests in which Defendant Wolf himself participated) is fatal for Defendants.[7] *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage

---

[7] This exemption also exposes Defendants' exaggeration of the risk of the virus. If this virus was as deadly as Defendants claim it to be, there would be no viewpoint exceptions, and Defendant Wolf would not have marched in the BLM protest.

to that supposedly vital interest unprohibited.") (internal quotations and citation omitted).

### 2.    Fourteenth Amendment—Right to Privacy.

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.  As well said by Judge Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." Cooley on Torts, 29.

*Union P. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891).  The U.S. Supreme Court recognizes a "right to privacy" that derives from the "penumbras, formed by emanations from" the Bill of Rights.  *Griswold*, 381 U.S. 484.  "There are at least two types of privacy protected by the Fourteenth Amendment: the individual interest in avoiding disclosure of personal matters, and the right to autonomy and independence in personal decision-making."  *Doe v. Delie*, 257 F.3d 309, 316 n.5 (3d Cir. 2001) (internal citations omitted).  As stated by the Second Circuit, "It is well established that the individual right to privacy is protected by the Due Process Clause of the Fourteenth Amendment.  The privacy right takes two somewhat different forms: the right to personal autonomy (*i.e*., the right to make certain choices free of unwarranted government interference) and the right to confidentiality (*i.e*., the right to hold certain information private)."

The Fourteenth Amendment similarly protects against any unwanted medical treatment as an invasion of personal autonomy and bodily integrity.  As the court in

*Davis v. Hubbard*, 506 F. Supp. 915 (N.D. Ohio 1980), relying on well-established tort law, properly observed:

> Closely related to a person's interest in body is his interest in making decisions about his body.  In the law of torts, this interest is reflected in the concept of consent.  For example, in the context of medical treatment, treatment by a physician in a non-emergency that is rendered without the patient's informed consent, or exceeds the consent given, is actionable as a battery. [citing cases].  The principle which supports the doctrine of informed consent is that *only the patient* has the right to weigh the risks attending the particular treatment *and decide for himself what course of action is best suited for him.*

*Id.* at 931-32 (citations omitted) (emphasis added); *see also United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000) (quoting *Cruzan v. Director, Mo. Dep't of Health,* 497 U.S. 261, 278 (1990)) ("Because any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity, the Supreme Court has indicated that there is 'a general liberty interest in refusing medical treatment.'").

The wearing of a mask is a form of "medical treatment."  Indeed, Defendants' stated basis for enforcing the mandate is for medical reasons.  Under the mask mandate, every Pennsylvanian has become the government's "patient" and thus compelled to accept this treatment regardless of whether the person is sick, infectious, or falls within a category of persons most susceptible to the virus.  In fact, those most susceptible to this respiratory illness (*i.e.*, people with respiratory problems) are exempt from the mandate.

Because the mandate infringes upon Plaintiffs' fundamental right to bodily integrity, the restriction must survive strict scrutiny, which it cannot.  The exemption for persons with respiratory issues alone is fatal for the government.  *See Church of Lukumi Babalu Aye*, 508 U.S. at 547.  Moreover, compelling healthy people who have virtually no risk of contracting or spreading the virus is not necessary nor can it be considered the least restrictive means available to the government (and this is further illustrated by the fact that almost anything qualifies as a "face covering" and the government urges private citizens not to use medical-grade face coverings).  This is particularly true regarding the requirement that children (a demographic that is nearly immune from the virus) wear masks at all times in school even if social distancing is maintained.  This is not the precision required when the government seeks to infringe upon fundamental liberties.   The mandate fails constitutional scrutiny.

## III.   Irreparable Harm.

"Deprivation of a constitutional right alone constitutes irreparable harm as a matter of law, and no further showing of irreparable harm is necessary." *Beattie v. Line Mt. Sch. Dist.*, 992 F. Supp. 2d 384, 396 (M.D. Pa. 2014); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.") (internal quotations and citations omitted);

*Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").   Plaintiffs have demonstrated irreparable harm as a matter of fact and law.

## IV.    Balance of Equities.

The likelihood of harm to Plaintiffs without the injunction is substantial because the deprivation of constitutional rights constitutes irreparable injury. (*See supra* § III.).   Additionally, Defendants' public health interest can be advanced by protecting the known demographic that is most susceptible to the virus.   The challenged restrictions are grossly overbroad and unnecessary.   They lack the precision required of regulations that infringe upon fundamental liberties.   In short, the balance of equities favors the granting of the requested injunction.  *See Reilly v. City of Harrisburg*, 336 F. Supp. 3d 451, 472 (M.D. Pa. 2018) ("It goes without saying, however, that a deprivation of a constitutional right is contrary to the public interest and the harm to others . . . although substantial, does not outweigh such a denial.").

## V.   Public Interest.

"'[I]it is always in the public interest to prevent the violation of a party's constitutional rights.'"  *Buck*, 485 F. Supp. 2d at 586-87 (quoting *G & V Lounge, Inc. V. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994)). "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003); *K.A. v. Pocono Mt. Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest.").  The public interest favors granting the requested injunction.

## CONCLUSION

For the foregoing reasons, this Court should grant the motion and issue the requested injunction.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.* (MI P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756; Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org
* Admitted *pro hac vice*

- 37 -

LAW OFFICE OF ANDREW H. SHAW. P.C.

/s/ *Andrea L. Shaw*
Andrea L. Shaw, Esq. (PA 89333)
2011 W. Trindle Road
Carlisle, Pennsylvania 17013
(717) 243-7135

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.8(b)(2) and this Court's order of October 1, 2020 (Doc. No. 15), granting Plaintiffs' request to file a brief not to exceed 9,000 words, I hereby certify that this brief contains 8,883 words.

I further certify that, in preparation of this document, I used Microsoft Word 2016, and that this word processing program has been applied specifically to include all text, including headings, footnotes, and quotations in the following word count.

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system.  Parties may access this filing through the court's system.  I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.