## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHAD PARKER,                              :
REBECCA KENWICK-PARKER,    :
MARK REDMAN, and                  :
DONNA REDMAN                        :
                                                   :    20-cv-1601
            Plaintiffs,                       :
                                                   :    Hon. John E. Jones III
      v.                                          :
                                                   :
TOM WOLF, *in his official*             :
*capacity as Governor for the State*  :
*of Pennsylvania*,                           :
JOSH SHAPIRO, *in his official capacity*  :
*as Attorney General of the State*      :
*of Pennsylvania*, and                      :
DR. RACHEL LEVINE, *in her official*   :
*capacity as Secretary of Health*,       :
*Pennsylvania Department of Health*,   :
                                                   :
            Defendants.                      :

## MEMORANDUM AND ORDER

### December 11, 2020

Presently pending before the Court is a Motion for Preliminary Injunction,

(the "Motion"), filed by Plaintiffs Chad Parker, Rebecca Kenwick-Parker

(together, the "Parker Plaintiffs" or the "Parkers"), Mark Redman, and Donna

Redman (together, the "Redman Plaintiffs" or the "Redmans") (collectively,

"Plaintiffs").  (Doc. 17).  Defendants are Tom Wolf, Governor of Pennsylvania;

Josh Shapiro, Pennsylvania's Attorney General; and Dr. Rachel Levine,

Pennsylvania's Secretary of Health (collectively, "Defendants").  The Motion has been fully briefed.  (Docs. 18, 23, 24).  We also convened a hearing on the Motion on November 24, 2020.[1]  Thus, the matter is ripe for our review.  For the reasons that follow, the Motion shall be denied.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This dispute arises amid the ongoing COVID-19 pandemic, a crisis which, as of the date of this opinion, has infected 463,175 Pennsylvanians and killed 12,066.[2]

On March 6, 2020, as the virus began infiltrating American communities in earnest, Governor Wolf declared a state of emergency.  (Doc. 18 at 9).  The Governor has subsequently extended the life of his emergency powers twice, most recently on August 31.  (*Id.*).  Two executive initiatives that, at least in part, emanate from this emergency declaration are challenged here: the Pennsylvania Department of Health's ("DOH") deployment of "contact tracing" (the "Contact Tracing Program") and an order generally requiring all individuals to wear face

---

[1]    The Court's citations to the Rough Uncertified Transcript of the November 24 Hearing are denoted "Tr."

[2]    *Pennsylvania Coronavirus Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html (last accessed Dec. 11, 2020).  Overall, nearly 300,000 Americans have perished.  CENTERS FOR DISEASE CONTROL AND PREVENTION, *CDC COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Dec. 11, 2020)

coverings in public, subject to certain limitations and exceptions (the "Mask

Mandate).  The motion *sub judice* asks us to enjoin Defendants' enforcement of the

Contact Tracing Program and the Mask Mandate.

### A. The Contact Tracing Program

"Contact tracing" is, according to the DOH, the "process of identifying,

notifying, and monitoring anyone who came in close contact with an individual

who tested positive for COVID-19 while they were infectious."  (Doc. 18 at 10–

11).  The DOH identifies "patients who are classified as being a confirmed or

probable case of COVID-19."  (*Id.* at 11) (emphasis omitted).  These patients are

referred to as "cases."  (*Id.*).  DOH receives these positive or probable[3] case

identifications from labs across the Commonwealth.  (Tr. 33:16–18).  "Within 24

hours of receiving the positive result, trained public heath staff conduct an

interview with the case to obtain a list of close contacts they had while infectious."

(Doc. 18 at 11).[4]  During the interview, the public health staff "attempt to obtain as

much information as possible on the contacts (address, phone, email, etc.) and then

---

[3]      Executive Deputy Secretary of Health Sarah Boateng explained at the November 24
Hearing that a "probable" COVID-19 test result is "from an antigen test or another symptom and
other clinical criteria such as you've been in close contact of a confirmed case.  That definition
[is] used in Pennsylvania and across the nation, both confirmed and probable are both cases of
COVID-19."  (Tr. 51:4–9).

[4]      DOH defines a "close contact" as one "either being within approximately 6 feet of a
COVID-19 case for a prolonged period of time, currently defined as at least 15 minutes . . . or
having direct contact with infectious secretions of a COVID-19 case (*e.g.*, being coughed on)."
(Doc. 18-3 at 16).

share the contact information with the designated contact tracers." (*Id.*) (emphasis omitted). The DOH, with permission of the individual, "enroll[s]" these close contacts in what is called the "Sara Alert system," which is a "symptom tracker tool." (Tr. 18:14–19:4). Sara Alert works in conjunction with "NEDSS," the Commonwealth's "disease surveillance system," which allows the contact tracers to "track, monitor, isolate and test symptomatic contacts and is further enhanced by the use of technology applications." (Doc. 18 at 13). This "web-based monitoring" enables contact tracers to "send daily emails, texts and/or phone calls to cases and identifies close contacts throughout their isolation/quarantine monitoring period." (*Id.*).

After the DOH obtains the list of "close contacts" the individual had while he or she was likely infectious, a letter, signed by DOH Secretary Levine, is mailed to each "close contact." The letter "direct[s]" the recipient to "self-quarantine in [their] home." (Doc. 18-3 at 16). The letter instructs that "if your exposure to the person with COVID-19 is ongoing, you must self-quarantine in your home for 14 days after the person with COVID-19 is released from isolation. If you do not live in the same household as the person with COVID-19, you must remain in quarantine in your home for 14 days from the date of last contact with the person with COVID-19." (*Id.*). Because a "negative test during the quarantine period will only show your infection status at the time of the test," and "[a] person can develop

the virus and become infectious between 2 and 14 days after exposure," the

recipient of the letter is directed to "quarantine for the entire 14 days even if you

have had a negative test during this time." (*Id.*). The letter, however, permits

recipients who are health care workers and do not have symptoms to leave their

homes, provided they remain asymptomatic, wear a mask, and practice social

distancing. (*Id.* at 17).

The letter further "direct[s]" the recipient while in quarantine to take his or

her temperature twice daily, monitor for other symptoms of COVID-19,

immediately report any symptoms requiring medical attention to the DOH, avoid

travel, "[m]aintain social distancing of at least 6 feet from family members,"

practice certain hygienic practices such as thorough hand-washing, and

"[c]ooperate with the monitoring and other contacts of the [DOH] or its

representatives." (*Id.*).

The letter concludes by directing the recipient to "immediately adhere to this

quarantine directive and all disease control measures included in it," and that upon

failure to cooperate, "the Secretary of Health may petition a court to have you

confined to an appropriate place chosen by the [DOH] to make certain that you are

not able to infect the public, and to make certain that you receive proper care." (*Id.*

at 18). Additionally, "[l]aw enforcement may be called upon, to the extent

necessary, to ensure [the recipient's] compliance with this directive." (*Id.*). The

5

DOH has not petitioned a court to forcibly quarantine or isolate any individual during the current pandemic.  (Tr. 17:14–23).

As part of the DOH's efforts to bolster the Contact Tracing Program, restaurants are "encouraged" to "utilize reservations for dining on premises to maintain records of all appointments, including contact information for all customers," while salons and barbershops are required to conduct business by appointment only.  (Doc. 18 at 14).  Schools throughout the Commonwealth are also required to "[t]ake measures that allow for exposed individuals to be more easily traced," such as using assigned seating, taking attendance, tracking all individuals who enter the classroom or school building (and keeping records of where, why, and who they visited in the building), and using sign-in sheets for all in-person staff meetings.  (*Id.*).  The Commonwealth has also launched a "contact tracing app" called COVID Alert PA, which Pennsylvanians can voluntarily download to their cell phones.  (Tr. 19:21–20:11).[5]

According to Plaintiffs, the DOH has received approval to spend millions of dollars to operate this Contact Tracing Program, has hired (or plans to hire) thousands of contact tracers, and has plans to set up a "hub and spoke" COVID-19

---

[5]     Executive Deputy Secretary Boateng explained that the COVID Alert PA app runs on similar technology to apps that Apple and Google have developed and installed on certain smartphone devices, but she emphasized that the Commonwealth's smartphone app is distinct from Apple and Google's COVID apps, and that the state app is entirely voluntary.  (Tr. 19:5–20:11).

testing system that will enable widespread rapid testing throughout the Commonwealth.  (Doc. 18 at 13–14).

### B. The Mask Mandate

On July 1, 2020, Secretary Levine issued an order requiring all Pennsylvanians to wear a "face covering" when in public.  (*Id.* at 15).  This first order coincided with the "opening up" of the Commonwealth following three months of business closures and other stringent mitigation efforts promulgated at the onset of the pandemic.  (Tr. 4:19–5:5; 35:22–23).  On November 17, 2020, Secretary Levine issued an updated order, which is currently the operative Mask Mandate challenged in this litigation.  (Doc. 29-1).

Secretary Levine issued the updated Mask Mandate because "[a]fter a brief respite in the summer months, case counts and the number of hospitalizations have been rising throughout the Commonwealth, surrounding states, and the world." (*Id.* at 2).  In fact, Pennsylvania and the nation had been "seeing the highest number of reported cases since the pandemic was declared in January."  (*Id.*). Secretary Levine explained that "social distancing, mask wearing, isolation and quarantine are the first line of defense against the disease's spread" and that "[e]xperience demonstrates that when used in public settings, face coverings reduce the spread of COVID-19 in the Commonwealth."  (*Id.* at 3).  Secretary Levine also cited CDC guidance that "universal face coverings, even when not

clinical-level masks, have been an effective mitigation strategy to prevent and control the spread of disease." (*Id.*).

The Mask Mandate defines a "face covering" as the "covering of the nose and mouth with material that is secured to the head with ties, straps, or loops over the ears or is wrapped around the lower face." (*Id.* at 4). A "variety of synthetic or natural fabrics" may be used, including "improvised [masks] [made] from household items." (*Id.*). While "procedural and surgical masks intended for health care providers and first responders, such as N95 respirators, meet those requirements, those specialized masks should be reserved for appropriate occupational and health care personnel." (*Id.*).

The Mask Mandate compels "every individual, age two and older" to wear a "face covering" when they are: 1) indoors or in an enclosed space (including a gym or fitness center), where another person from outside the individual's household is present in the same space (irrespective of physical distance); 2) outdoors with others outside of the individual's household where sustained physical distance cannot be maintained; 3) waiting in a public area for, riding on, driving, or operating public transportation or in a taxi, car service, or ride-sharing vehicle (irrespective of physical distance); 4) obtaining services from the healthcare sector; and 5) working in any space where food is prepared, packaged for sale, or prepared

for distribution to others.  (*Id.* at 5).  Further, certain facilities, such as hospitals, shelters, long-term care facilities, residential treatment facilities, and correctional facilities, may require visitors and residents (including patients or inmates) to wear a face covering even in a living unit.  (*Id.*).

The Mask Mandate details a variety of exceptions to the universal face covering requirement.  An individual need not wear a mask if wearing one while working would create an unsafe condition in which to operate equipment or execute a task; if wearing a mask would cause or exacerbate a medical condition, including respiratory issues that impede breathing, a mental health condition, or a disability; when necessary to confirm an individual's identity; when obtaining a service that requires temporary removal of the mask, such as dental services; when working alone and isolated from other people, with little or no expectation of in-person interaction; and if the individual is communicating or seeking to communicate with an individual who is hearing-impaired or who otherwise requires the ability to see the mouth for communication.  (*Id.* at 5–6).

The Mask Mandate also places certain obligations on businesses and schools.  (*Id.* at 6).  They must require all persons to wear a face covering and take reasonable steps to enforce the Mask Mandate, including mitigating or eliminating exposure to people who cannot wear or refuse to wear one, and posting prominent

signs stating that masks are required by order of the Secretary of Health.  (*Id.*).

The entities must provide reasonable accommodations to those who have a medical

condition, mental heath condition, or disability, but businesses may decline service

to such individuals so long as an attempt to provide a reasonable

accommodation—like a face shield or providing service options that do not require

the customer to enter the business—is made.  (*Id.*).  In addition, businesses and

schools are explicitly forbidden from enforcing the Mask Mandate when it is

unsafe to do so, when using force to ensure compliance would be otherwise illegal,

or when doing so would violate any other law, including anti-discrimination laws.

(*Id.* at 6–7).

### C. Plaintiffs' Alleged Injuries

Plaintiffs object to the Contract Tracing Program and Mask Mandate as

overbroad and unnecessary impingements on their constitutional rights.  As such,

they allege the following harms resulting from the two programs.

### i.   *The Parker Plaintiffs*

Plaintiff Chad Parker strenuously objects to the Mask Mandate.  He and his

wife, Plaintiff Rebecca Kenwick-Parker, believe that "the wearing of a face mask

during this current declared and highly politicized pandemic has become a political

symbol and an attempt by the government to control the citizenry"  (Doc. 18-3 at 4,

¶ 7).  The Parkers perceive face masks as "political symbols," and that the

"wearing of a mask is a form of symbolic speech."  Therefore, they argue, being

forced to wear one is the equivalent of being required to "convey a message with

which [they] disagree."  (*Id.* at ¶¶ 8–9).  The Parker Plaintiffs also allege that the

Mask Mandate violates their privacy interests, including their right to bodily

integrity and personal autonomy free from government interference.  (*Id.* at ¶ 11).

Their objections originate, at least in part, from their assertion that "the efficacy of

a mask is far from proven[.]"  (*Id.* at ¶10).

The Parkers have also personally been impacted by the Contact Tracing

Program.  Plaintiff Parker, a state government employee, sought medical treatment

on July 14, 2020, believing he had a sinus infection.  (*Id.* at 5, ¶ 13).  Five days

later, he was tested for COVID-19, which yielded a positive result on July 24.

(*Id.*).  Ironically, Plaintiff Parker was cleared to return to work that same day.[6]

(*Id.*).  He returned to work on July 25.  (*Id.*).

Also on July 25, Plaintiff Parker received a phone call from a DOH contact

tracer, whom he alleges asked him "probing questions, including who [he] live[s]

with, the ages of the individuals [he] live[s] with, the names of any businesses or

other places [he] recently visited, and the names and contact information of any

---

[6]      While it may seem strange that Plaintiff Parker was cleared to return to work the same
day he received a positive test, Executive Deputy Secretary Boateng explained that the
recommended ten-day isolation period began to run on the day he first reported symptoms, on
July 14.  (Tr. 14:7–15:5).  Therefore, that ten-day window ended on July 24.

people [he] recently visited or had contact with."  (*Id.* at ¶ 14).  He and his wife, Plaintiff Rebecca Kenwick-Parker, were "disturbed by the intensive questioning" and "by the investigation itself, which sought personal and private information regarding [their] personal and private contacts and associations."  (*Id.*).

Shortly after the "probing phone call," the Parker Plaintiffs received a letter from DOH addressed to the entire "Parker/Kenwick Family."  (*Id.* at 6, ¶ 15).  The letter contained the same directives (and threat of enforcement) as detailed in Section I.A, *supra*.  (*Id.* at ¶ 16).  Specifically, the letter directed the Parker family to quarantine in their home for fourteen days and to maintain social distancing of at least six feet from each other.  (*Id.* at ¶ 17).  Plaintiff Parker avers that no one else in the household demonstrated any symptoms despite their close contact with him during his infectious period, yet they still were "forced" to quarantine for fourteen days beginning on July 25.  (*Id.* at 7, ¶ 19).  Plaintiff Parker claims this was the equivalent of "house arrest" with no procedural protections in place.[7]  (*Id.* at ¶ 20).

Plaintiff Parker also alleges that he received "approximately 14 texts a day" for about a month following his interview with the contact tracer.  (*Id.* at ¶ 21). The texts (which were generated by the Sara Alert system) "required" him to

---

[7]     For example, Plaintiff Parker argues that DOH should have to demonstrate probable cause before directing an individual or family to self-quarantine.  (Doc. 18-3 at 7, ¶ 20).

respond to a "Daily Self-Report," and there was apparently no way to stop the "incessant messages."  (*Id.*).

The Parkers now believe they are "in the government's contact tracing database" and they "fear" they "will be subjected once again to a quarantine."  (*Id.* at 8, ¶ 22).  They also "object to being subjected to surveillance, [and] having [their] personal medical records reviewed by" DOH.[8]  (*Id.*).

Because they are afraid of being surveilled and potentially ordered to quarantine again, the Parker Plaintiffs have made at least two adjustments to their lifestyle.  First, they refuse to send their 14-year-old son to school.  (*Id.* at ¶ 23).  Plaintiff Parker explains that his wife homeschools her three children (Plaintiff Parker is the step-father) and gives the children the option to attend public school once they reach the 8th grade.  (*Id.*).  The 14-year-old attended public school last year for 8th grade and was ostensibly planning on attending public high school this year.  (*Id.*).  However, because of the Contact Tracing Program (as well as the Mask Mandate), the family "was forced" to homeschool him and incur the costs of obtaining a home school curriculum appropriate for a ninth grader.  (*Id.*).  They aver that they will not send the children to public school "[s]o long as the contact tracing program and mask mandate remain in effect."  (*Id.*).  Second, the Parker

---

[8]      It is not clear, however, the extent to which Plaintiff Parker's medical records were transmitted and reviewed by DOH beyond merely the result of his positive COVID-19 test.

Plaintiffs "will think twice before seeking medical treatment . . . especially when the symptoms are minor," and they will likewise "avoid businesses, restaurants, and other public or social events that may keep rosters, lists, video or other ways to document persons who entered the business establishment or attended the event." (*Id.* at 8–9, ¶ 24).

### ii.    *The Redman Plaintiffs*

Like the Parkers, the Redmans also perceive face masks as symbolic of "an attempt by the government to control the citizenry." (Doc. 18-2 at 24, ¶ 55). They believe that by requiring the Redmans to wear masks in public, Defendants are "forcing" them to "convey messages with which [they] disagree." (*Id.* at 25, ¶ 57). They also maintain that the Mask Mandate violates certain privacy interests, such as their right to bodily integrity and personal autonomy free from government interference. (*Id.* at 26, ¶ 60). Furthermore, the Redmans believe that they "do not live in a 'nanny state,'" they "believe it should be up to each individual to decide whether he or she should wear a mask based on his or her own personal situation and concerns," and they believe the government "has no right to force this medical intervention upon private citizens—particularly citizens who are healthy." (*Id.* at 34, ¶ 74).

Unlike the Parkers, however, the Redman Plaintiffs have had no personal connection to the Contact Tracing Program. They have not received the quarantine

directive letter that the Parker family received—they are merely "familiar with the content of the letter."  (*Id.* at 19–20, ¶ 40).  But because of the Contact Tracing Program (and the Mask Mandate), "particularly as it will apply in the public schools," the Redmans have been "forced" to have their two children "attend school remotely rather than in person."  (*Id.* at 21, ¶ 47).  They assert that the "risk of having their children subjected to the oppression and penalties associated with the contact tracing program while attending a public school is too great."  (*Id.*). Because the children are not attending school in-person, they are at a "disadvantage" without the benefit of "in-person socializing with their peers, [] interacting personally with their teachers or being present in classes such as laboratory science where a student's presence is important."  (*Id.* at 22, ¶ 48).  One of their children has an individualized education plan, ("IEP"), and so is at a further disadvantage by attending school remotely.  (*Id.* at ¶ 49).

The Redmans also allege that they are harmed by the Contact Tracing Program in three other ways.  Because they "do not want to have any data or information available [on their cell phones] that the government may seize to quarantine" them or their children (or those they associate with), the Redmans have stopped using a smartphone app called "Life360" (which they previously used to track the whereabouts of their children) and have "purposely deactivated updates" to their cell phones to "avoid the unwanted installation of tracking and surveillance

software." (*Id.* at 22–23, ¶ 50).  Despite their best efforts, the Redmans say that

COVID-19 tracking technology "was installed" on their cell phones.[9]  (*Id.*).

Second, the family has "curtailed attending religious services" because their usual

place of worship "requires pre-registration in order to attend in-person services

within the church" and the Redmans want to "avoid providing data or information

that the government may acquire or seize[.]"  (*Id.* at 23, ¶ 51).  Finally, like the

Parkers, the Redmans "will avoid seeking medical treatment" and will avoid other

establishments that may keep records of their attendance.  (*Id.* at ¶ 52).

### D. Procedural History

Plaintiffs filed their complaint on September 23, 2020.  (Doc. 1).  They

allege seven constitutional abuses stemming from the Contact Tracing Program

and Mask Mandate, including violations of the First Amendment right of

association (Count I); the Due Process Cause of the Fourteenth Amendment (Count

II); the Equal Protection Clause of the Fourteenth Amendment (Count III); the

Guarantee Clause, Article IV, Section 4 (Count IV); the Fourteenth Amendment

right to privacy (Count V); the Fourth Amendment right against unlawful searches

and seizures (Count VI); and First Amendment freedom of speech (Count VII).

(*Id.* at 31–41).  Plaintiffs' complaint seeks a declaratory judgment that Defendants

---

[9]     Though it is not clear, we presume that this technology was installed in a software update by either Apple or Google, and is not technology that Defendants somehow remotely placed onto the Redmans' phones.

have violated their fundamental constitutional rights, an order enjoining Defendants' enforcement of the two challenged programs, and an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.  (*Id.* at 41).

Plaintiffs filed the motion *sub judice* on October 6, asking that we preliminarily enjoin Defendants' enforcement of the Contact Tracing Program and the Mask Mandate based on four theories: 1) the Contact Tracing Program violates their First Amendment right of association and/or expression; 2) the Contact Tracing constitutes a "house arrest" and an unlawful search and seizure under the Fourth Amendment; 3) the Mask Mandate violates their First Amendment right against compelled speech; and 4) the Mask Mandate violates their Fourteenth Amendment right to privacy.  (Doc. 17).  After the parties completed briefing on the Motion, (Docs. 18, 23, 24), we convened a hearing on November 24, 2020. We now consider whether a preliminary injunction is warranted based on Plaintiffs' allegations.  We ultimately conclude that, because they lack standing to enjoin enforcement of either the Contact Tracing Program or the Mask Mandate, the Motion must be denied.

## II.   LEGAL STANDARD

Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ("TRO") or preliminary injunction.  *See Ellakkany v. Common Pleas Court*

*of Montgomery Cnty.*, 658 Fed.Appx. 25, 27 (3d Cir. July 27, 2016) (applying one standard to a motion for both a TRO and preliminary injunction).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Apotex Inc. v. U.S. Food and Drug Admin.*, 508 F.Supp.2d 78, 82 (D.D.C. 2007) ("Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly."). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Groupe SEC USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

## III.   DISCUSSION

Though Defendants do not raise any objection to Plaintiffs' standing to challenge the Contact Tracing Program or the Mask Mandate, "it is well established that," as an Article III court, we have "an independent obligation to

assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citing *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986)).  We therefore must analyze Plaintiffs' alleged injuries to determine whether they establish Article III standing.  We conclude that they do not.

For a plaintiff to establish Article III standing, the plaintiff must suffer an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  These requirements originate from separation-of-powers principles and "serve[] to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* at 408 (citing *Summers*, 555 U.S. at 492–93).

The standing doctrines also serve several other "implicit policies embodied in Article III," including the assurance that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)).  In sum, we must ensure that the plaintiff has a

"personal stake in the outcome of the controversy."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotation marks omitted).

The Supreme Court has been clear that an injury, to be cognizable, must not be "too speculative."  *Clapper*, 568 U.S. at 409.  Rather, the injury must be "*certainly* impending."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992)) (emphasis in original).  "[A]llegations of *possible* future injury" are not sufficient.  *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original).  This is also the case when a plaintiff seeks an injunction to enjoin future conduct—such a plaintiff must establish that she is "likely to suffer future injury from the defendant's conduct."  *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018) (quoting *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)) (internal quotation marks omitted).

**A. Plaintiffs' Standing to Challenge the Contact Tracing Program**

Plaintiffs' allege three types of injuries as a result of the Contact Tracing Program: 1) they fear being subjected to a future quarantine directive; 2) they fear being subjected to "government surveillance"; and 3) because of those fears, they have injuriously curtailed their lifestyles in certain ways, such as refusing to send their children to school and refusing to frequent business establishments that may keep records of their attendance.  This latter "injury" is essentially that their rights

have been effectively "chilled" by Defendants' operation of the Contact Tracing Program.  *See Laird v. Tatum*, 408 U.S. 1, 10 (1972).

But these "injuries" cannot confer Article III standing to challenge the contours of the Contact Tracing Program.  Plaintiffs have not established that future injury from the Contact Tracing Program is either likely or "certainly impending."  Instead, their theories of standing "rel[y] on a highly attenuated chain of possibilities."  *Clapper*, 568 U.S. at 410; *see also Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 636 (3d Cir. 1996) (Wellford, J., concurring) ("Fear and apprehension about a possible future physical or medical consequence . . . is not enough to establish an injury *in fact*." (emphasis in original)).   They have also failed to establish any present, cognizable injuries related to contact tracing that would be redressable by favorable ruling.

First, Plaintiffs have failed to establish that a future order from DOH directing them to quarantine or self-isolate is likely.  To the contrary, this alleged injury rests almost entirely on conjecture and speculation.  For any of the Plaintiffs to be subjected to a quarantine directive in the future, each of the following must occur: first, they must be in sustained "close contact" (within six feet for cumulatively longer than fifteen minutes) with another person; second, that person must receive a test for COVID-19; third, that test must come back either "positive" or "probable"; fourth, that test result is sent to the DOH (which, presumably, might

not happen if the individual receives a test in a different state, or if they receive a test from a non-DOH-approved lab, or if the testing lab for some reason is not mandated to report test results through NEDSS); fifth, a DOH contact tracer must call the infected individual; sixth, that individual must actually pick up the phone; and seventh, the individual must tell the contact tracer that he or she was in close contact with one of the Plaintiffs. If any one of those does not occur, then a quarantine directive will not result. While it is possible that DOH may be directing individuals to quarantine based solely on information contact tracers glean from restaurants, schools, and businesses that have been keeping records of visitors and patrons, there has been no evidence submitted that this has been occurring or is likely to occur.

With this in mind, we conclude that Plaintiffs have failed to establish that a future quarantine directive addressed to them is likely, let alone substantially likely, to occur. None of the Plaintiffs allege that they are likely to be in sustained close contact with a potentially infectious person in the future. Indeed, they all appear to be following standard, recommended protocol for any reasonable citizen during a worldwide pandemic: they are limiting their exposure to other people by not eating at restaurants or receiving a professional haircut indoors, they are "thinking twice" before receiving elective or non-urgent medical care, and their children are not attending school in-person. Nothing about Plaintiffs' situations

makes them any more likely to receive a quarantine directive than any other Pennsylvanian; absent any other facts, Plaintiffs seem even *less* likely to receive a quarantine directive than other, less risk-averse citizens.  There is no allegation, for example, that any of the Plaintiffs are at an increased risk of being in close contact with an infectious person due to the nature of their job.  Similarly, Plaintiffs do not allege that they refuse to abide by other COVID-19 safety protocols, like social distancing.[10]  Fundamentally, nothing alleged by these Plaintiffs indicates that a future quarantine directive from DOH directed towards any of them is imminent or even likely.

The Parker Plaintiffs allege that because they already received a quarantine directive over the summer, they are now "in Defendants' contact tracing database," and are more likely to be subjected to a quarantine order again in the future.  (Doc. 18 at 22).  But even if the quarantine directive previously sent to them *did* violate their rights, that fact alone is not enough to establish an impending risk of future harm.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.") (internal quotations and citation omitted); *Free Speech Coal.,*

---

[10]     While Plaintiffs say they "feel the 'need to have a voice' by not wearing the mandated mask in public," (Doc. 18 at 38), the DOH's definition of a "close contact" does not take into account whether masks were worn during the period of sustained contact, (Doc. 18-3 at 16).

*Inc. v. Attorney Gen. United States*, 825 F.3d 149, 165–66 (3d Cir. 2016) ("That some of FSC's members have previously undergone searches pursuant to the regulations here is not sufficient on its own to confer standing to seek injunctive relief."); *McNair*, 672 F.3d at 225 (holding that past injuries "may suffice to confer individual standing for monetary relief" but "a plaintiff seeking injunctive relief must demonstrate a likelihood of future harm").  Even if the Parker Plaintiffs are indeed in a "contact tracing database," it is still far too speculative to conclude that they will be subject to a quarantine directive again in the future.  As explained above, they still must be in sustained contact with another person who tests positive for COVID-19 and who then reports to DOH that they were in close contact with one of the Parkers.

While the DOH's possession of the Parkers' home address and contact information would presumably make it easier to send them a letter, this does not make it more likely that any of the Parkers will be in sustained close contact with an infectious person in the future, which is a necessary predicate for one to receive the quarantine directive.  *See Lujan*, 504 U.S. at 564 (holding that an alleged injury-in-fact must be accompanied by "continuing, present adverse effects"); *cf. Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011) (holding that an increased risk of identity theft—even if the plaintiff also expended time and money to limit such

risk—was insufficient to confer Article III standing).[11]  The likelihood that the

Parkers will receive a future quarantine directive—to the extent that by itself is

actually a cognizable injury—is just as speculative as the Redmans' chances.  For

all four Plaintiffs, this exercise is simply too conjectural to find Article III

standing.[12]  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The

equitable remedy [injunctive relief] is unavailable absent a showing of irreparable

injury, a requirement that cannot be met where there is no showing of any real or

immediate threat that the plaintiff will be wronged again—a 'likelihood of

---

[11]     We observe as well that Plaintiffs, multiple times in their briefing as well as at oral
argument, call into question the infectiousness and/or deadliness of COVID-19.  (Doc. 18-2 at
27, ¶ 62) ("[T]he percentages [of COVID-19 cases and deaths compared to the general
population] are shockingly low.").  This skepticism would be difficult to reconcile with an
assertion—had Plaintiffs made it—that the Plaintiffs are substantially likely to either contract
COVID-19 or be in close contact with an infectious person in the future.

        While Plaintiffs do question the accuracy of COVID-19 PCR testing, they cite to just one
*New York Times* article, and only for the proposition that "[t]he standard tests are diagnosing
huge numbers of people who may be carrying relatively insignificant amounts of the virus."  (*Id.*
at 11, ¶ 20).  In other words, Plaintiffs have not made an explicit (or persuasive) argument that
COVID-19 testing is so inaccurate that they face a substantial likelihood of being erroneously
subjected to a quarantine directive based on sustained close contact with an individual who tests
positive for COVID-19 but is not actually infectious.  If anything, Plaintiffs merely object to the
possibility of arguably unnecessary quarantine directives to contacts of individuals who likely
*have* COVID-19 but are not shedding large quantities of the virus; again, there is still no credible
assertion of impending future injury, and Plaintiffs' incredulous skepticism of COVID-19's true
infection rate would actually serve to undermine such an argument.

[12]     It is also noteworthy that, while the quarantine directive letter threatens enforcement of
its instructions, to date DOH has not actually enforced any COVID-19 quarantine directives.
Further, should DOH determine that an *involuntary* quarantine is necessary, the DOH must first
petition a court.  Accordingly, to the extent Plaintiffs not only fear a future quarantine directive,
but also fear being involuntary quarantined by the Commonwealth without certain procedural
protections, those fears are even more attenuated and conjectural, considering the procedures
DOH must follow before forcibly quarantining a citizen.

substantial and immediate irreparable injury.'  The speculative nature of Lyons'

claim of future injury requires a finding that this prerequisite of equitable relief has

not been fulfilled.") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)); *see

also Liberian Cmty. Ass'n of Connecticut v. Lamont*, 970 F.3d 174, 184 (2d Cir.

2020) ("Appellants [who were actually subjected to a mandatory, involuntary

quarantine during the Ebola outbreak] failed to plead a sufficient likelihood that,

under the revised policy, any of them faces a substantial risk of suffering a future

injury.") (citing *Lyons*, 461 U.S. at 106–07).

Plaintiffs' alleged fears of "surveillance" resulting from the operation of

Contact Tracing Program are also insufficient to confer standing.  This fear of

"surveillance" appears to originate from two sources.  First, Section 27.60 of Title

28 of Pennsylvania's Administrative Code—which is cited in the DOH quarantine

directive letter that the Parkers received—allows the DOH to direct the

"surveillance, segregation, quarantine or modified quarantine of contacts of a

person or animal with a communicable disease of infection," in addition to any

other disease control measure "necessary to protect the public from the spread of

infectious agents."  28 Pa. Code § 27.60(a).  This regulation appears to merely

enable the DOH to initiate contact tracing in the event of a communicable or

infectious disease outbreak.  Based on the plain language of the regulation, the

DOH can only "surveil" individuals if they are "contacts of a person . . . with a

communicable disease or infection." As previously discussed, Plaintiffs have not established that they face a substantial risk of being in close contact with an infectious person.

Second, Plaintiffs quote language from a DOH press release that refers to the Commonwealth's "disease surveillance system (NEDSS)." (Doc. 18 at 13). While the term "disease surveillance system" may appear ominous, in reality NEDSS (the National Electronic Disease Surveillance System) simply "facilitates electronically transferring public health surveillance data from the healthcare system to public health departments." *PA-NEDSS*, PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/Reporting-Registries/Pages/PA-NEDSS.aspx (last accessed December 7, 2020). As used in Pennsylvania, NEDSS "allows for the healthcare system to report diseases and investigative findings" to the DOH, and it "further allows for the PA DOH to report diseases and findings to the CDC." *Id.* While Plaintiffs object to "having their personal medical records reviewed by the DOH," (Doc. 18 at 23), there is no cognizable injury alleged in this respect. Plaintiffs' medical records would only be "reviewed" if they test positive for COVID-19 and the test result is sent to DOH—but, again, Plaintiffs have not established any facts indicating they are likely to contract COVID-19 in the future. Moreover, NEDSS operates independently of the Contract Tracing Program. The DOH requires electronic reporting of several diseases, including cancer (28 Pa.

27

Code § 27.31), HIV and AIDS (28 Pa. Code § 27.32a), certain sexually transmitted diseases (28 Pa. Code § 27.33), and lead poisoning (28 Pa. Code § 27.34). Plaintiffs do not challenge the general legality of this disease-reporting system, but rather "object" to the possibility that the DOH may "review" their medical records[13] if they test positive for COVID-19.  (Doc. 18 at 23).  As already established, this is too speculative.[14]  Plaintiffs' generalized objection to "government surveillance" therefore does not confer Article III standing here.

Finally, to the extent Plaintiffs have been presently injured by their self-imposed efforts (e.g., avoiding certain businesses, "thinking twice" before receiving non-urgent medical care, etc.) to avoid a possible future quarantine directive and/or potential "surveillance," both the Supreme Court and Third Circuit have rejected such a theory of Article III injury-in-fact—where plaintiffs self-incur certain costs or injuries without a concrete showing that a violation of their rights is "certainly impending," there is no Article III standing.  *See Sherwin-Williams Co. v. Cty. of Delaware, Pennsylvania*, 968 F.3d 264, 269–70 (3d Cir. 2020) (observing that, in a First Amendment challenge, "an allegation that certain

---

[13]    This too is speculative—Plaintiffs have no evidence that "medical records" in their entirety, as opposed to merely the positive test result, are transmitted from a testing laboratory to the DOH pursuant to NEDSS.

[14]    Also, because NEDSS would continue to fully operate even if the COVID-19 Contact Tracing Program is enjoined, the injunction would not prevent the transmittal of Plaintiffs' medical records to DOH if Plaintiffs contract some *other* disease or condition.

conduct has (or will have) a chilling effect on one's speech must claim a 'specific present objective harm or a threat of specific future harm.'") (quoting *Laird*, 408 U.S. at 13–14).

In *Laird*, plaintiffs challenged the U.S. Army's surveillance of lawful and peaceful civilian political activity; their alleged injury was that their First Amendment rights were "chilled" by the existence of the government's investigative program.  *Laird*, 408 U.S. at 10.  The Court held that, although "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights," the *Laird* plaintiffs failed to establish Article III standing where their claim was essentially that "they disagree with the judgments made by the Executive Branch with respect to the type and amount of information the Army needs and that the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights."  *Id.* at 13–14. Plaintiffs' allegations of a subjective "chilling effect" based on impermissible government activity "[were] not an adequate substitute for a claim of specific present objective harm or a [credible] threat of specific future harm[.]"  *Id.*

The Supreme Court reached a similar conclusion in *Clapper*, where plaintiffs had sought an injunction against the government's potential use of a Foreign Intelligence Surveillance Act provision to intercept their communications.

*Clapper*, 568 U.S. at 401.  The Court held that their theory of future injury was too speculative to meet the "certainly impending" test discussed above.  *Id.*  Their alternative theory—that they were suffering present injuries because they had taken "costly and burdensome measures to protect the confidentiality of their international communications"—also failed.  *Id.* at 402.  The Court explained that because they "d[id] not face a threat of certainty impending interception" under the challenged statute, "the costs that they have incurred to avoid surveillance [were] simply the product of their fear of surveillance," and the Court's decision in *Laird* "makes it clear that such a fear is insufficient to create standing."  *Id.* at 417 (citing *Laird*, 408 U.S. at 10–15).  Again, the Court clarified that "allegations of a subjective chill" are insufficient for Article III standing without a valid claim of specific future harm.  *Id.* at 417–18.  Here, because Plaintiffs have not established that future harm in the form of a quarantine order from DOH is certainly impending, or even likely to occur, their allegations of present harm due to self-imposed injuries similarly cannot confer Article III standing.

Nor would these present "chill"-based injuries even be redressable by favorable decision here.[15]  The Redman Plaintiffs have "curtailed" their attendance

---

[15]     And some of the alleged injuries, like the Redmans' refusal to use their "Life360" smartphone application or the installation of COVID-19 tracking software on their cell phones by Apple or Android, are clearly not traceable to Defendants.  *See Lujan*, 504 U.S. at 560–61 ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]

at religious services, but only because *their church* "requires pre-registration." (Doc. 18-2 at 22–23, ¶ 50).  An injunction prohibiting Defendants from contact-tracing has no bearing on whether the Redmans' church will continue to require pre-registration.  The same goes for all the business establishments Plaintiffs refuse to frequent—those businesses may very well continue to track attendance of patrons so that they can conduct their own version of contact-tracing out of a concern for the health and safety of their employees and customers.  And it is difficult, if not impossible, to imagine that public schools would cease taking attendance of students and keeping records of outside visitors absent the Commonwealth's current contact-tracing operation.  To the contrary, it is practically certain that those commonsense security measures will persist even if we granted the requested injunction.  *See Lujan*, 504 U.S. at 568–71.

Instead of specific, concrete allegations of likely or certainly impending future harm, Plaintiffs merely present generalized grievances regarding the Contact Tracing Program.  At bottom, the injuries Plaintiffs allegedly suffer due to Defendants' operation of the Contract Tracing Program are exactly the same fears and burdens faced by every Pennsylvanian.  The only potentially meaningful difference here is that Plaintiffs harbor certain ideological objections to the policy.

---

result [of] the independent action of some third party not before the court.'") (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

But even if their injuries were cognizable, the injunction that Plaintiffs request would not necessarily alleviate the present burdens Plaintiffs claim to be suffering. Because Plaintiffs' alleged injuries are not concrete and particularized, actual or imminent, or redressable by a favorable decision, Plaintiffs lack standing to challenge the Contact Tracing Program.[16]

### B. Plaintiffs' Standing to Challenge the Mask Mandate

Plaintiffs' standing to request an injunction enjoining enforcement of the Mask Mandate is a closer call.  Plaintiffs allege that because masks have become a "political symbol," the Mask Mandate is the equivalent of compelled speech. (Doc. 18 at 16).  Plaintiffs also allege that, because masks are the equivalent of "unwanted medical treatment," the Mandate constitutes an invasion of their privacy and violates their right to personal autonomy.  (*Id.* at 40–42).  Third, Plaintiffs intertwine the same "chill"-based injuries regarding the Contact Tracing Program with their objections to the Mask Mandate—for example, they refuse to send their children to public school both because of contact tracing *and* because their children would be required to wear a mask.  (*Id.* at 24).

---

[16]     "Our system of government leaves many crucial decisions to the political processes.  The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974).

From Plaintiffs' allegations, we deduce two separate theories of Article III standing to challenge the Mask Mandate: 1) the very act of wearing a mask harms Plaintiffs because a mask is either compelled speech or an invasion of bodily privacy, and 2) the threat of Defendants' enforcement of the mandate constitutes an injury.  We reject both theories.

### i.    The Alleged Injuries Inherent in Compelled Mask-Wearing

We begin with the first theory—that Plaintiffs are injured each time they wear a mask.  Because we "must separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim," we must assume for this standing analysis that a mask does indeed constitute compelled speech and/or an unwanted medical procedure.  *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *5 (M.D. Pa. Nov. 21, 2020), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020) (quoting *Cottrell v. Alcon Laboratories*, 874 F.3d 154, 161–62 (3d Cir. 2017)).  To that end, we initially find that Plaintiffs have stated a concrete, *de facto* injury.  *See Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S. Ct. 1540, 1548 (2016) ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist.").  While the harm associated with compelled speech might be intangible, the Supreme Court has held that such a First Amendment injury may "nevertheless be concrete." *Id.* at 1549 (citing *Pleasant Grove City v. Summum*,

555 U.S. 460 (2009)).  And if a mask is the equivalent of an unwanted medical

procedure, then Plaintiffs are concretely harmed each time they are required to don

one against their wishes.  *See In re Horizon Healthcare Servs. Inc. Data Breach*

*Litig.*, 846 F.3d 625, 637 (3d Cir. 2017) ("The first test [of two, to determine

whether an intangible injury can be considered "concrete"], the one of history, asks

whether 'an alleged intangible harm' is closely related 'to a harm that has

traditionally been regarded as providing a basis for a lawsuit in English or

American Courts.'") (quoting *Spokeo*, 136 S. Ct. at 1549).

Based on the breadth of the Mask Mandate—citizens must wear a face

covering essentially whenever they are in public spaces, or even in their own

homes if others outside their family are present—we also have no trouble finding

the alleged injury is "actual or imminent."  We likewise conclude that the alleged

injury is traceable to Defendants, who either instituted the Mask Mandate or who

likely bear at least some responsibility for enforcing it.[17]  We cannot find, however,

that Plaintiffs meet the "particularity" or "redressability" requirements for standing

under this theory of present and ongoing harm.

---

[17]    Defendants argue that Plaintiffs' claims against Defendant Shapiro must be dismissed
because Plaintiffs' complaint is devoid of any factual allegations as to his personal involvement
with the challenged orders.  (Doc. 23 at 27–28).  Because we conclude that Plaintiffs lack
standing to receive their desired injunction, we decline to address the "personal involvement"
issue—in addition to Defendants' Eleventh Amendment immunity argument, (*Id.* at 13)—at this
juncture.

First, regarding particularity, the alleged injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560; *Spokeo*, 136 S. Ct. at 1548 ("We have made it clear time and time again that an injury in fact must be both concrete *and* particularized."). Every citizen in the Commonwealth, unless they fall under an exemption, is required to wear a face covering in public pursuant to the Mask Mandate. While it is true that "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance," *Spokeo*, 136 S. Ct. at 1548 n.7, the Supreme Court has articulated other considerations relevant to the "particularity" analysis. The alleged injury must be both "distinct," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), as well as not "undifferentiated," *United States v. Richardson*, 418 U.S. 166, 177 (1974). Here, we struggle to conclude that the Mask Mandate *distinctly* affects Plaintiffs. *See Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336, 349 (3d Cir. 2020) ("When the alleged injury is undifferentiated and common to all members of the public, courts routinely dismiss such cases as 'generalized grievances' that cannot support standing."). Plaintiff's alleged injuries suffered as a result of wearing a mask are *identical* to every other citizen in the Commonwealth. To be clear, it is not the sheer number of people who suffer the same injuries claimed by Plaintiffs that forecloses a finding of "particularity"— it is that each of those citizens, under Plaintiffs' theory, suffers an injury

*indistinguishable* from any other Pennsylvanian.  *Cf. Carney v. Adams*, 592 U.S. __, slip op. at 10 (2020) ("Adams has not sufficiently differentiated himself from  a general population of individuals affected in the abstract by the legal provision he attacks.").  Under such a circumstance, Plaintiffs' allegations are no more than generalized grievances.

As for redressability, again "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)) (internal quotation marks omitted).  Here, it is too speculative to conclude that Plaintiffs' injuries—specifically, the injuries that result from simply wearing a mask—will be alleviated by an injunction prohibiting Defendants from enforcing the Mask Mandate.  Plaintiffs will almost certainly still need to wear a mask in some, if not most, public spaces.  The requested injunction, for example, may not prevent *local* authorities from enforcing the executive order, even if these three Defendants may not; the injunction would not void the Mask Mandate, but would only enjoin the Governor, Secretary of Health, and the Attorney General from enforcing it.  *See Updated Order of the Secretary of the Pennsylvania Department of Health Requiring Universal Face Coverings – Frequently Asked Questions*, PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Guidance/Universal-

Masking-FAQ.aspx (last accessed December 8, 2020) ("[I]f there is a legitimate concern about a situation of non-compliance with the Order, local law enforcement agencies can be contacted through their non-emergency phone numbers to investigate issues of compliance.").

It is also not clear whether the requested injunction would reach the state police and prohibit them from enforcing the Mask Mandate through warnings or summary citations, even if the Attorney General would not be permitted to prosecute violations. An injunction would similarly not have any impact on whether local businesses, schools, or places of worship will require patrons to wear masks even without the threat of state enforcement. Indeed, because we are still amid a (by any reasonable measure, worsening) global pandemic, it is rather *likely* Plaintiffs would still be required to wear a mask in those spaces. Furthermore, the requested injunction would not reach any local municipalities that have enacted local ordinances or issued executive orders requiring universal face coverings, nor would it prohibit local municipalities from creating new mandates in the absence of a state-wide order. An injunction here will simply not alleviate the injuries Plaintiffs claim to suffer when they wear a mask—those injuries will almost certainly persist even in the absence of state-level enforcement of the Mask Mandate. This first theory of harm is therefore insufficient to confer standing.

###### ii.   *Plaintiffs' Standing to Seek Pre-Enforcement Review*

Even if we construe Plaintiffs' claim as a pre-enforcement challenge, Plaintiffs still lack standing to challenge the Mask Mandate.  "[W]here threatened action by government is concerned," a plaintiff is not required to "expose himself to liability before bringing suit to challenge the basis for the threat."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–129 (2007); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.").  Instead, courts permit "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  The Supreme Court has explained that a plaintiff has Article III standing to bring pre-enforcement review where she alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Id.* (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Plaintiffs here have neither sufficiently established an intention to engage in the proscribed conduct, nor have they persuaded us that they face a credible threat of future enforcement by the Defendants.

Plaintiffs have only claimed to "feel the 'need to have a voice' by not wearing the mandated mask in public," (Doc. 18 at 38) (emphasis in original), but they say nothing else about their intention to violate the Mask Mandate.  Even if we grant that Plaintiffs do intend to engage in that proscribed course of conduct—a maskless protest—their pleadings are devoid of any facts that make it likely they will be subject to enforcement of the Mask Mandate in the future.

Indeed, Plaintiffs point to the fact that Governor Wolf participated in a Black Lives Matter protest over the summer where "some of the protestors were not wearing masks and social distancing was not practiced."  (*Id.*).  Plaintiffs bemoan that the Mask Mandate was not enforced during that protest, but they explicitly acknowledge that Defendant Levine has stated that the Commonwealth was "not restricting people's right to protest" and that Governor Wolf "is always supportive of that[.]"  (*Id.*).  Plaintiffs claim that allowing one form of protest (Black Lives Matter) but prohibiting Plaintiffs' intended protest (not wearing a mask) constitutes viewpoint-based discrimination.  Without touching the merits of this argument here, we observe that Plaintiffs' argument undermines a claim that they face a credible threat of enforcement if they choose to protest the Mask Mandate.  Protests against the Mask Mandate have been held since July, yet Plaintiffs have not shown us that any enforcement actions have been taken against maskless protestors.  *See* Steve Marroni, *Rally held at Capitol to protest mask mandates,*

*Gov. Wolf's coronavirus restrictions*, PENNLIVE.COM (July 22, 2020),

https://www.pennlive.com/news/2020/07/rally-held-at-capitol-to-protest-mask-

mandates-gov-wolfs-coronavirus-restrictions.html.  While it is true that there is no

explicit  "First Amendment exemption" contained in the Mask Mandate, (Tr. 73:9–

17), Plaintiffs have nonetheless failed to establish that they face a credible threat of

future enforcement or prosecution by Defendants.[18]  And to the extent they allege

(which they do not explicitly) a credible threat of having a business establishment

enforce the mandate against them, should they attempt to enter a business without

a mask,[19] it bears repeating that the requested injunction would only apply to the

three state-official defendants before us.  While businesses who no longer face a

threat of state enforcement *may* (subject to local orders) allow Plaintiffs to enter

their establishment without a mask, it is too speculative to conclude this would

---

[18]     While Plaintiffs point to the DOH's "snitch line" that enables citizens to report non-compliance with the Mask Mandate, (Doc. 18 at 17–18), this "complaint portal" is intended for Pennsylvanians to "file a complaint related to a *business* regarding . . . [the] mitigation orders, [and] not just the masking order," (Tr. 7:15–24) (emphasis added).  The portal was not intended for the reporting of an individual person who does not comply with the Mask Mandate.  (Tr. 8:3–5).

[19]     Plaintiffs do *not* explicitly allege that they intend to enter businesses without wearing a mask.  Indeed, even in the absence of a mandate, a person might nonetheless feel the need to wear a mask in public, whether it be for their own health or safety, to avoid unwanted attention (or even potential harassment) from others, or simply because they recognize that it might make the people in their presence more comfortable.  Plaintiffs may harbor doubts as to the efficacy of universal face coverings during the COVID-19 crisis, (Doc. 18 at 18), but even mask-skeptics may see the social value of wearing one in public.  In other words, Plaintiffs' skepticism and their desire to have a choice whether or not they wear a mask do not necessarily constitute allegations that they *intend* to enter public spaces and interact with other people without wearing a face covering.

actually happen, again considering that we are still in the pandemic's throes.  In

short, Plaintiffs have not shown that *they* face a credible threat of enforcement by

*these* Defendants, and so they have not established Article III standing to warrant

the desired injunction.

### iii.   Other District Courts Have Reached the Same Result

Our conclusion—that Plaintiffs' two theories of injury-in-fact are not

sufficient to establish the requisite standing to get an injunction prohibiting

enforcement of the Mask Mandate—is bolstered by reference to the three other

District Courts nationwide that have reached similar outcomes.  In *Bechade v.*

*Baker*, No. 20-11122, 2020 WL 5665554 (D. Mass. Sept. 23, 2020), a plaintiff

challenged a Massachusetts state-wide face covering order on three federal law

grounds: that the mandate violated her Fourteenth Amendment right to privacy, her

Fourteenth Amendment right to decline unwanted medical treatment, and that it

violated the First Amendment because the order had the effect of abridging speech

by suppressing facial expression.  *Bechade*, 2020 WL 5665554, at *2.  The court

held that the plaintiff failed to allege "that she has *personally* been forced to wear a

mask or to require her employees to wear a mask on any occasion," meaning that

she had failed to establish "that she suffered any concrete and particularized injury

with respect to the mask requirement "  *Id.* (emphasis in original).  The court also

noted that to the extent plaintiff was injured by the threat of enforcement (a fine for

noncompliance), this harm was likewise "insufficient to establish standing," as "[e]very citizen of Massachusetts faces this same general threat of enforcement," and the plaintiff failed "to plead any individual desire or intention to violate the mask requirement which might distinguish her from other residents." *Id.* at *3. The plaintiff therefore had neither successfully established that the threat of enforcement was concrete and particularized to her, nor that her harm was actual or imminent. *Id.*

In *Shelton v. City of Springfield*, No. 6:20-cv-03258, 2020 WL 6323935 (W.D. Mo. Oct. 28, 2020), a woman claimed that a city's mask order impeded her right to worship and her right to privacy, even though she was exempted from the mandate due to a medical condition. *Shelton*, 2020 WL 6323935, at *2. Despite her exemption, the plaintiff claimed she was injured by the order due to her fears of a fine for failure to comply with the order, because "she cannot enjoy life with this government interference," and because she feared harassment from other citizens. *Id.* The court rejected her claims, finding that she lacked standing to challenge the ordinance. *Id.* at *3. Specifically, the court held that the plaintiff's alleged fear of harassment from others or from certain business establishments that might not accept her stated exemption was a hypothetical harm and not an actual injury that plaintiff had sustained—but even if it did constitute a concrete injury, it would not be traceable to the city-defendants. *Id.* at *4.

42

And in *Cangelosi v. Edwards*, No. 20-cv-1991, 2020 WL 6449111 (E.D. La. Nov. 3, 2020), a plaintiff who challenged a statewide mask order in Louisiana also lost on standing grounds.  The court focused on the traceability and redressability requirements—specifically, because the mask order could only be enforced against private businesses, and because a private business could refuse service to any person for any non-discriminatory reason, "[t]he proposition that an injunction against the Governor would relieve the plaintiff of having to wear a face covering in order to enter certain businesses is highly speculative."  *Cangelosi*, 2020 WL 6449111, at *4.  The court observed that "while Plaintiff may question the efficacy of face coverings in preventing the spread of COVID-19, the owners of private businesses may not feel the same way.  With or without the Mask EP being in effect, those business owners might very well require a face covering before entering their premises both for the protection of their employees and for the protection of their other patrons who might otherwise be disinclined to enter the premises if a face covering is not required."  *Id.*

Though those cases may differ factually from Plaintiffs' claims in this action, the underlying logic espoused by our three colleagues applies with persuasive force: Article III courts can only adjudicate live "cases" and "controversies"—disputes that can be "appropriately resolved through the judicial process" as opposed to the political or legislative spheres.  *Lujan*, 504 U.S. at 560.

43

Because Plaintiffs do not have standing to challenge the Mask Mandate, we must

deny the Motion.[20]

---

[20]     Even if Plaintiffs had standing to seek an injunction prohibiting Defendants from operating the Contact Tracing Program and enforcing the Mask Mandate, they have not established a likelihood of success on the merits of their claims.  The framework of our merits analysis would generally be defined by *Jacobson v. Massachusetts*, 197 U.S. 11 (1905).  There, the Supreme Court rejected a substantive due process challenge to a mandatory vaccination law, holding that the state could "protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson*, 197 U.S. at 27.  The overwhelming majority of federal courts that have adjudicated constitutional challenges to COVID-19 mitigation efforts have utilized a two-part test based on *Jacobson*'s text—a plaintiff must show that the challenged order either (1) has "no real or substantial relation" to protecting public health, or (2) that it is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31; *see, e.g.*, *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'") (quoting *Jacobson*, 197 U.S. at 31); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) ("At least at this stage of the pandemic, *Jacobson* takes off the table any general challenge to EO43 based on the Fourteenth Amendment's protection of liberty."); *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) ("[W]e find that the district court's failure to apply the *Jacobson* framework produced a patently erroneous result."); *AJE Enterprise LLC v. Justice*, No. 1:20-CV-229, 2020 WL 6940381, at *2, *5 (N.D. W. Va. Oct. 27, 2020) ("[T]he vast majority of courts have looked to *Jacobson* in their analysis of various pandemic responses. . . . Based upon the teachings of *Jacobson*, this Court will apply the rational basis standard in evaluating the orders in question[,] [but even if] *Jacobson* [was] not the controlling precedent, this Court would be compelled to continue to apply the rational basis standard.") (collecting cases); *Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130, 2020 WL 6777590, at *2 (D. Md. Nov. 18, 2020) (collecting cases).

     As applied here, both the Contact Tracing Program and the Mask Mandate have a real and substantial relation to public health, and neither shocks the conscience. They are, at worst, minor and fleeting inconveniences, especially when compared to the widespread infectiousness and death that Defendants credibly seek to avoid through these two orders.

     But even if we declined to displace ordinary tiers of scrutiny for this *Jacobson*-derived deference to governmental action during public heath emergencies, we are confident that Plaintiffs would *still* not succeed on the merits of their claims.  Aside from hurdling rational basis or strict scrutiny review, Plaintiffs would also have needed to convince us that the balance of equities weighs in their favor and that an inunction would be in the public interest. *See Winter*, 555 U.S. at 20.  That they have not done.  As we previously concluded in *Benner v. Wolf*, 461 F. Supp. 3d 154, 167–68 (M.D. Pa. 2020), Plaintiffs' injuries do not "outweigh the grave

## IV.   CONCLUSION

Nearly nine months, and quickly approaching a full year, into this global pandemic, we are *all* fatigued.  We have not been able to hug our loved ones, attend school or work in-person, or frequent our favorite restaurants and local businesses.  *All* of our lives have changed drastically, and, indeed, many of us are weary of continued mitigation efforts.  But our Constitution does not permit us to consider such frustrations without concrete, particularized, and non-hypothetical allegations that are capable of full resolution by this court.  The present lawsuit expresses real and significant constitutional concerns—which we do not take lightly.  As an Article III court, we have an obligation to tackle justiciable constitutional violations head-on, including during proclaimed emergencies.  But some legal actions, no matter how well-intended and no matter how passionately litigated, cannot be adjudged by a court of limited jurisdiction.  This is one of those cases.  Because Plaintiffs have not suffered an injury sufficient to warrant judicial review, we must deny the Motion.

---

harms that could result to all Pennsylvanians from a widespread COVID-19 outbreak." *Benner*, 461 F.Supp.3d at 167–68.  Especially considering that the number of cases, hospitalizations, and deaths are climbing, we would again decline to "micromanage public policy in the midst of a pandemic."  *Id.* at 168.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Plaintiffs' Motion for Preliminary Injunction, (Doc. 17), is **DENIED**.

2. Plaintiffs' Motion for Leave to File Notice of Supplemental Authority, (Doc. 32), is **DENIED AS MOOT**.

<u>s/ John E. Jones III</u>
John E. Jones III, Chief Judge
United States District Court
Middle District of Pennsylvania
